# COLLEGE SAVINGS BANK *v.* FLORIDA PREPAID POSTSECONDARY EDUCATION EXPENSE BOARD ET AL.

No. 98-149.   Argued April 20, 1999—Decided June 23, 1999

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 691. BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post*, p. 693.

*David C. Todd* argued the cause for petitioner. With him on the briefs was *Deborah M. Lodge*.

*Solicitor General Waxman* argued the cause for the United States, respondent under this Court's Rule 12.6, urging reversal. With him on the briefs were *Acting Assistant Attorney General Ogden, Deputy Solicitor General Wallace, Malcolm L. Stewart, Mark B. Stern, Michael E. Robinson,* and *H. Thomas Byron III.*

*William B. Mallin* argued the cause for respondent Florida Prepaid Postsecondary Education Expense Board. With him on the brief were *Joseph M. Ramirez* and *Louis F. Hubener.**

JUSTICE SCALIA delivered the opinion of the Court.

The Trademark Remedy Clarification Act (TRCA), 106 Stat. 3567, subjects the States to suits brought under § 43(a)

---

*\*Martin H. Redish* and *Jerome Gilson* filed a brief for the International Trademark Association as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Ohio et al. by *Betty D. Montgomery,* Attorney General of Ohio, *Edward B. Foley,* State Solicitor, and *Elise W. Porter,* Assistant Solicitor, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Mark Pryor* of Arkansas, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *M. Jane Brady* of Delaware, *Margery S. Bronster* of Hawaii, *James E. Ryan* of Illinois, *J. Joseph Curran, Jr.,* of Maryland, *Jennifer Granholm* of Michigan, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *Patricia A. Madrid* of New Mexico, *Eliot Spitzer* of New York, *W. A. Drew Edmondson* of Oklahoma, *D. Michael Fisher* of Pennsylvania, *Sheldon Whitehouse* of Rhode Island, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *Jan Graham* of Utah, *Mark L. Earley* of Virginia, *Christine O. Gregoire* of Washington, *Darrell V. McGraw, Jr.,* of West Virginia, and *Gay Woodhouse* of Wyoming; and for the National Conference of State Legislatures et al. by *Richard Ruda* and *James I. Crowley.*

*Charles A. Miller, Caroline M. Brown, Gerald P. Dodson, James E. Holst, P. Martin Simpson, Jr.,* and *Richard L. Stanley* filed a brief for the Regents of the University of California as *amicus curiae.*

of the Trademark Act of 1946 (Lanham Act) for false and misleading advertising, 60 Stat. 441, 15 U. S. C. § 1125(a). The question presented in this case is whether that provision is effective to permit suit against a State for its alleged misrepresentation of its own product—either because the TRCA effects a constitutionally permissible abrogation of state sovereign immunity, or because the TRCA operates as an invitation to waiver of such immunity which is automatically accepted by a State's engaging in the activities regulated by the Lanham Act.

I

In *Chisholm* v. *Georgia*, 2 Dall. 419 (1793), we asserted jurisdiction over an action in assumpsit brought by a South Carolina citizen against the State of Georgia. In so doing, we reasoned that Georgia's sovereign immunity was qualified by the general jurisdictional provisions of Article III, and, most specifically, by the provision extending the federal judicial power to controversies "between a State and Citizens of another State." U. S. Const., Art. III, § 2, cl. 1. The "shock of surprise" created by this decision, *Principality of Monaco* v. *Mississippi*, 292 U. S. 313, 325 (1934), prompted the immediate adoption of the Eleventh Amendment, which provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Though its precise terms bar only federal jurisdiction over suits brought against one State by citizens of another State or foreign state, we have long recognized that the Eleventh Amendment accomplished much more: It repudiated the central premise of *Chisholm* that the jurisdictional heads of Article III superseded the sovereign immunity that the States possessed before entering the Union. This has been our understanding of the Amendment since the landmark

case of *Hans* v. *Louisiana,* 134 U. S. 1 (1890). See also *Ex parte New York,* 256 U. S. 490, 497–498 (1921); *Principality of Monaco, supra,* at 320–328, *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S. 89, 97–98 (1984); *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44, 54, 66–68 (1996).

While this immunity from suit is not absolute, we have recognized only two circumstances in which an individual may sue a State. First, Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment—an Amendment enacted after the Eleventh Amendment and specifically designed to alter the federal-state balance. *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976). Second, a State may waive its sovereign immunity by consenting to suit. *Clark* v. *Barnard,* 108 U. S. 436, 447–448 (1883). This case turns on whether either of these two circumstances is present.

## II

Section 43(a) of the Lanham Act, 15 U. S. C. § 1125(a), enacted in 1946, created a private right of action against "[a]ny person" who uses false descriptions or makes false representations in commerce. The TRCA amends § 43(a) by defining "any person" to include "any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity." § 3(c), 106 Stat. 3568. The TRCA further amends the Lanham Act to provide that such state entities "shall not be immune, under the eleventh amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person, including any governmental or nongovernmental entity for any violation under this Act," and that remedies shall be available against such state entities "to the same extent as such remedies are available . . . in a suit against" a nonstate entity. § 3(b) (codified in 15 U. S. C. § 1122).

Petitioner College Savings Bank is a New Jersey chartered bank located in Princeton, New Jersey. Since 1987,

it has marketed and sold CollegeSure certificates of deposit designed to finance the costs of college education. College Savings holds a patent upon the methodology of administering its CollegeSure certificates. Respondent Florida Prepaid Postsecondary Education Expense Board (Florida Prepaid) is an arm of the State of Florida. Since 1988, it has administered a tuition prepayment program designed to provide individuals with sufficient funds to cover future college expenses. College Savings brought a patent infringement action against Florida Prepaid in United States District Court in New Jersey. That action is the subject of today's decision in *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank, ante,* p. 627. In addition, and in the same court, College Savings filed the instant action alleging that Florida Prepaid violated § 43(a) of the Lanham Act by making misstatements about its own tuition savings plans in its brochures and annual reports.

Florida Prepaid moved to dismiss this action on the ground that it was barred by sovereign immunity. It argued that Congress had not abrogated sovereign immunity in this case because the TRCA was enacted pursuant to Congress's powers under Article I of the Constitution and, under our decisions in *Seminole Tribe, supra,* and *Fitzpatrick, supra,* Congress can abrogate state sovereign immunity only when it legislates to enforce the Fourteenth Amendment. The United States intervened to defend the constitutionality of the TRCA. Both it and College Savings argued that, under the doctrine of constructive waiver articulated in *Parden* v. *Terminal R. Co. of Ala. Docks Dept.,* 377 U. S. 184 (1964), Florida Prepaid had waived its immunity from Lanham Act suits by engaging in the interstate marketing and administration of its program after the TRCA made clear that such activity would subject Florida Prepaid to suit. College Savings also argued that Congress's purported abrogation of Florida Prepaid's sovereign immunity in the TRCA

was effective, since it was enacted not merely pursuant to Article I but also to enforce the Due Process Clause of the Fourteenth Amendment. The District Court rejected both of these arguments and granted Florida Prepaid's motion to dismiss. 948 F. Supp. 400 (N. J. 1996). The Court of Appeals affirmed. 131 F. 3d 353 (CA3 1997). We granted certiorari. 525 U. S. 1063 (1999).

## III

We turn first to the contention that Florida's sovereign immunity was validly abrogated. Our decision three Terms ago in *Seminole Tribe, supra,* held that the power "to regulate Commerce" conferred by Article I of the Constitution gives Congress no authority to abrogate state sovereign immunity. As authority for the abrogation in the present case, petitioner relies upon § 5 of the Fourteenth Amendment, which we held in *Fitzpatrick* v. *Bitzer, supra,* and reaffirmed in *Seminole Tribe,* see 517 U. S., at 72–73, could be used for that purpose.

Section 1 of the Fourteenth Amendment provides that no State shall "deprive any person of . . . property . . . without due process of law." Section 5 provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article." We made clear in *City of Boerne* v. *Flores,* 521 U. S. 507, 516–529 (1997), that the term "enforce" is to be taken seriously—that the object of valid § 5 legislation must be the carefully delimited remediation or prevention of constitutional violations. Petitioner claims that, with respect to § 43(a) of the Lanham Act, Congress enacted the TRCA to remedy and prevent state deprivations without due process of two species of "property" rights: (1) a right to be free from a business competitor's false advertising about its own product, and (2) a more generalized right to be secure in one's business interests. Neither of these qualifies as a property right protected by the Due Process Clause.

As to the first: The hallmark of a protected property interest is the right to exclude others. That is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna* v. *United States*, 444 U. S. 164, 176 (1979). That is why the right that we all possess to use the public lands is not the "property" right of anyone—hence the sardonic maxim, explaining what economists call the "tragedy of the commons,"[1] *res publica, res nullius.* The Lanham Act may well contain provisions that protect constitutionally cognizable property interests—notably, its provisions dealing with infringement of trademarks, which are the "property" of the owner because he can exclude others from using them. See, *e. g., K mart Corp.* v. *Cartier, Inc.*, 485 U. S. 176, 185–186 (1988) ("Trademark law, like contract law, confers private rights, which are themselves rights of exclusion. It grants the trademark owner a bundle of such rights"). The Lanham Act's false-advertising provisions, however, bear no relationship to any right to exclude; and Florida Prepaid's alleged misrepresentations concerning its own products intruded upon no interest over which petitioner had exclusive dominion.

Unsurprisingly, petitioner points to no decision of this Court (or of any other court, for that matter) recognizing a property right in freedom from a competitor's false advertising about its own products. The closest petitioner comes is dicta in *International News Service* v. *Associated Press*, 248 U. S. 215, 236 (1918), where the Court found equity jurisdiction over an unfair-competition claim because "[t]he rule that a court of equity concerns itself only in the protection of property rights treats any civil right of a pecuniary nature as a property right." But to say that a court of equity "*treats* any civil right of a pecuniary nature *as* a property right" is not to say that all civil rights of a pecuniary nature *are* property rights. In fact, when one reads the full pas-

---

[1] See Hardin, The Tragedy of the Commons, 162 Science 1243 (1968).

sage from which this statement is taken it is clear that the Court was saying just the opposite, namely, that equity will treat civil rights of a pecuniary nature as property rights even though they are properly not such:

> "In order to sustain the jurisdiction of equity over the controversy, we need not affirm any general and absolute property in the news as such. The rule that a court of equity concerns itself only in the protection of property rights treats any civil right of a pecuniary nature as a property right . . . ; and the right to acquire property by honest labor or the conduct of a lawful business is as much entitled to protection as the right to guard property already acquired. . . . It is this right that furnishes the basis of the jurisdiction in the ordinary case of unfair competition." *Id.*, at 236–237.

We may also note that the unfair competition at issue in *International News Service* amounted to nothing short of theft of proprietary information, something in which a power to "exclude others" could be said to exist. See *id.*, at 233.

Petitioner argues that the common-law tort of unfair competition "by definition" protects property interests, Brief for Petitioner 15, and thus the TRCA "by definition" is designed to remedy and prevent deprivations of such interests in the false-advertising context. Even as a logical matter, that does not follow, since not everything which *protects* property interests is designed to remedy or prevent *deprivations* of those property interests. A municipal ordinance prohibiting billboards in residential areas protects the property interests of homeowners, although erecting billboards would ordinarily not deprive them of property. To sweep within the Fourteenth Amendment the elusive property interests that are "by definition" protected by unfair-competition law would violate our frequent admonition that the Due Process Clause is not merely a "font of tort law." *Paul* v. *Davis*, 424 U. S. 693, 701 (1976).

Petitioner's second assertion of a property interest rests upon an argument similar to the one just discussed, and suffers from the same flaw. Petitioner argues that businesses are "property" within the meaning of the Due Process Clause, and that Congress legislates under § 5 when it passes a law that prevents state interference with business (which false advertising does). Brief for Petitioner 19–20. The assets of a business (including its good will) unquestionably are property, and any state taking of those assets is unquestionably a "deprivation" under the Fourteenth Amendment. But business in the sense of *the activity of doing business,* or *the activity of making a profit* is not property in the ordinary sense—and it is only *that,* and not any business asset, which is impinged upon by a competitor's false advertising.

Finding that there is no deprivation of property at issue here, we need not pursue the follow-on question that *City of Boerne* would otherwise require us to resolve: whether the prophylactic measure taken under purported authority of § 5 (viz., prohibition of States' sovereign-immunity claims, which are not in themselves violations of the Fourteenth Amendment) was genuinely necessary to prevent violation of the Fourteenth Amendment. We turn next to the question whether Florida's sovereign immunity, though not abrogated, was voluntarily waived.

## IV

We have long recognized that a State's sovereign immunity is "a personal privilege which it may waive at pleasure." *Clark* v. *Barnard,* 108 U. S., at 447. The decision to waive that immunity, however, "is altogether voluntary on the part of the sovereignty." *Beers* v. *Arkansas,* 20 How. 527, 529 (1858). Accordingly, our "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 241 (1985). Generally, we will find a waiver either if the State voluntarily invokes our jurisdic-

tion, *Gunter* v. *Atlantic Coast Line R. Co.*, 200 U. S. 273, 284 (1906), or else if the State makes a "clear declaration" that it intends to submit itself to our jurisdiction, *Great Northern Life Ins. Co.* v. *Read*, 322 U. S. 47, 54 (1944). See also *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S., at 99 (State's consent to suit must be "unequivocally expressed"). Thus, a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation. *Smith* v. *Reeves*, 178 U. S. 436, 441–445 (1900). Nor does it consent to suit in federal court merely by stating its intention to "sue and be sued," *Florida Dept. of Health and Rehabilitative Servs.* v. *Florida Nursing Home Assn.*, 450 U. S. 147, 149–150 (1981) *(per curiam)*, or even by authorizing suits against it "'in any court of competent jurisdiction,'" *Kennecott Copper Corp.* v. *State Tax Comm'n*, 327 U. S. 573, 577–579 (1946). We have even held that a State may, absent any contractual commitment to the contrary, alter the conditions of its waiver and apply those changes to a pending suit. *Beers* v. *Arkansas, supra.*

There is no suggestion here that respondent Florida Prepaid expressly consented to being sued in federal court. Nor is this a case in which the State has affirmatively invoked our jurisdiction. Rather, petitioner College Savings and the United States both maintain that Florida Prepaid has "impliedly" or "constructively" waived its immunity from Lanham Act suit. They do so on the authority of *Parden* v. *Terminal R. Co. of Ala. Docks Dept.*, 377 U. S. 184 (1964)— an elliptical opinion that stands at the nadir of our waiver (and, for that matter, sovereign-immunity) jurisprudence. In *Parden*, we permitted employees of a railroad owned and operated by Alabama to bring an action under the Federal Employers' Liability Act (FELA) against their employer. Despite the absence of any provision in the statute specifically referring to the States, we held that the Act authorized suits against the States by virtue of its general provision subjecting to suit "[e]very common carrier by railroad . . .

engaging in commerce between . . . the several States," 45 U. S. C. § 51 (1940 ed.). We further held that Alabama had waived its immunity from FELA suit even though Alabama law expressly disavowed any such waiver:

> "By enacting the [FELA] . . . Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the Act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have accepted that condition and thus to have consented to suit." 377 U. S., at 192.

The four dissenting Justices in *Parden* refused to infer a waiver because Congress had not "expressly declared" that a *State* operating in commerce would be subject to liability, but they went on to acknowledge—in a concession that, strictly speaking, was not necessary to their analysis—that Congress possessed the power to effect such a waiver of the State's constitutionally protected immunity so long as it did so with clarity. *Id.*, at 198–200 (opinion of White, J.).

Only nine years later, in *Employees of Dept. of Public Health and Welfare of Mo.* v. *Department of Public Health and Welfare of Mo.*, 411 U. S. 279 (1973), we began to retreat from *Parden.* That case held—in an opinion written by one of the *Parden* dissenters over the solitary dissent of *Parden's* author—that the State of Missouri was immune from a suit brought under the Fair Labor Standards Act by employees of its state health facilities. Although the statute specifically covered the state hospitals in question, see 29 U. S. C. § 203(d) (1964 ed.), and such coverage was unquestionably enforceable in federal court by the United States, 411 U. S., at 285–286, we did not think that the statute expressed with clarity Congress's intention to supersede the States' immunity from suits brought by individuals. We "put to one side" the *Parden* case, which we characterized as involving "dramatic circumstances" and "a rather isolated state activity,"

411 U. S., at 285, unlike the provision of the Fair Labor Standards Act in question that applied to a broad class of state employees. We also distinguished the railroad in *Parden* on the ground that it was "operated for profit" "in the area where private persons and corporations normally ran the enterprise." 411 U. S., at 284. Justice Marshall, joined by Justice Stewart, went even further, concluding that although, in their view, Congress *had* clearly purported to subject the States to suits by individuals in federal courts, it lacked the constitutional authority to do so. *Id.*, at 287, 289–290 (opinion concurring in result).

The next year, we observed (in dictum) that there is "no place" for the doctrine of constructive waiver in our sovereign-immunity jurisprudence, and we emphasized that we would "find waiver only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Edelman* v. *Jordan*, 415 U. S. 651, 673 (1974) (internal quotation marks omitted). Several Terms later, in *Welch* v. *Texas Dept. of Highways and Public Transp.*, 483 U. S. 468 (1987), although we expressly avoided addressing the constitutionality of Congress's conditioning a State's engaging in Commerce Clause activity upon the State's waiver of sovereign immunity, we said there was "no doubt that *Parden*'s discussion of congressional intent to negate Eleventh Amendment immunity is no longer good law," and overruled *Parden* "to the extent [it] is inconsistent with the requirement that an abrogation of Eleventh Amendment immunity by Congress must be expressed in unmistakably clear language," 483 U. S., at 478, and n. 8.[2]

---

[2] In response to this string of cases criticizing or narrowing the holding of *Parden*, JUSTICE BREYER holds up three post-*Parden* cases as decisions that "support[ed]" *Parden*, *post*, at 696, or at least "carefully avoided calling [it] into question," *post*, at 698. His perception of "support" in *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234 (1985), rests upon nothing more substantial than the fact that the case "suggest[ed] that a waiver

College Savings and the United States concede, as they surely must, that these intervening decisions have seriously limited the holding of *Parden*. They maintain, however, that *Employees* and *Welch* are distinguishable, and that a core principle of *Parden* remains good law. A *Parden*-style waiver of immunity, they say, is still possible after *Employees* and *Welch* so long as the following two conditions are satisfied: First, Congress must provide unambiguously that the State will be subject to suit if it engages in certain specified conduct governed by federal regulation. Second, the State must voluntarily elect to engage in the federally regulated conduct that subjects it to suit. In this latter regard, their argument goes, a State is never deemed to have constructively waived its sovereign immunity by engaging in activities that it cannot realistically choose to abandon, such

---

may be found in a State's acceptance of a federal grant." *Post*, at 696. But we make the same suggestion today, while utterly rejecting *Parden*. As we explain elsewhere in detail, see *infra*, at 686–687, conditions attached to a State's receipt of federal funds are simply not analogous to *Parden*-style conditions attached to a State's decision to engage in otherwise lawful commercial activity. JUSTICE BREYER's second case, *Welch*, overruled *Parden* in part, as we discuss above, and we think it quite impossible to believe that the following statement in the opinion did not "questio[n] the holding of *Parden* that the Court today discards,"*post*, at 698: "We assume, without deciding or intimating a view of the question, that the authority of Congress to subject unconsenting States to suit in federal court is not confined to §5 of the Fourteenth Amendment." 483 U. S., at 475. Calling what a prior case has flatly decided a "question" in need of "deciding," and (lest there be any doubt on the point) making it clear that we "intimat[e] no view" as to whether the answer given by that prior case was correct, surely was handwriting on the wall which even an inept cryptologist would recognize as spelling out the caption of today's opinion. As for *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996), we explain elsewhere, see *infra*, at 682–684, how that case was logically and practically inconsistent with *Parden*, even though it did not expressly overrule it. JUSTICE BREYER realizes this well enough, or else his call for an overruling of that case, which occupies almost half of his dissent, see *post*, at 699–705, would be supremely irrelevant to the matter before us.

as the operation of a police force; but constructive waiver is appropriate where a State runs an enterprise for profit, operates in a field traditionally occupied by private persons or corporations, engages in activities sufficiently removed from "core [state] functions," Reply Brief for United States 3, or otherwise acts as a "market participant" in interstate commerce, cf. *White* v. *Massachusetts Council of Constr. Employers, Inc.*, 460 U. S. 204, 206–208 (1983). On this theory, Florida Prepaid constructively waived its immunity from suit by engaging in the voluntary and nonessential activity of selling and advertising a for-profit educational investment vehicle in interstate commerce after being put on notice by the clear language of the TRCA that it would be subject to Lanham Act liability for doing so.

We think that the constructive-waiver experiment of *Parden* was ill conceived, and see no merit in attempting to salvage any remnant of it. As we explain below in detail, *Parden* broke sharply with prior cases, and is fundamentally incompatible with later ones. We have never applied the holding of *Parden* to another statute, and in fact have narrowed the case in every subsequent opinion in which it has been under consideration. In short, *Parden* stands as an anomaly in the jurisprudence of sovereign immunity, and indeed in the jurisprudence of constitutional law. Today, we drop the other shoe: Whatever may remain of our decision in *Parden* is expressly overruled.

To begin with, we cannot square *Parden* with our cases requiring that a State's express waiver of sovereign immunity be unequivocal. See, *e. g., Great Northern Life Ins. Co.* v. *Read*, 322 U. S. 47 (1944). The whole point of requiring a "clear declaration" *by the State* of its waiver is to be certain that the State in fact consents to suit. But there is little reason to assume actual consent based upon the State's mere presence in a field subject to congressional regulation. There is a fundamental difference between a State's expressing unequivocally that it waives its immunity and Congress's

expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity. In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals. That is very far from concluding that *the State* made an "altogether voluntary" decision to waive its immunity. *Beers*, 20 How., at 529.[3]

Indeed, *Parden*-style waivers are simply unheard of in the context of *other* constitutionally protected privileges. As we said in *Edelman*, "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights." 415 U. S., at 673. For example, imagine if Congress amended the securities laws to provide with unmistakable clarity that anyone committing fraud in connection with

---

[3] In an attempt to cast doubt on our characterization of *Parden* as a groundbreaking case, JUSTICE BREYER points to three earlier decisions which allegedly demonstrate that *Parden* worked no major change. These cases, however, have only the most tenuous relation to *Parden*'s actual holding—as one might suspect from the dissent's soft-pedaled description of them as "roughly comparable" and involving (in quotation marks) "'waivers.'" *Post*, at 696. The first two, *United States* v. *California*, 297 U. S. 175 (1936), and *California* v. *Taylor*, 353 U. S. 553 (1957), involved neither state immunity from suit nor waiver, but the entirely different question whether substantive provisions of Commerce Clause legislation applied to the States. The former concerned a suit brought against a State by *the United States* (a situation in which state sovereign immunity does not exist, see *United States* v. *Texas*, 143 U. S. 621 (1892)), and the latter expressly acknowledged that "the Eleventh Amendment" was "not before us," 353 U. S., at 568, n. 16. The last case, *Gardner* v. *New Jersey*, 329 U. S. 565 (1947), which held that a bankruptcy court can entertain a trustee's objections to a claim filed by a State, stands for the unremarkable proposition that a State waives its sovereign immunity by voluntarily invoking the jurisdiction of the federal courts. See *supra*, at 675–676. In sum, none of these cases laid any foundation for *Parden*— whose author was quite correct in acknowledging that it "presented a question of first impression," *Employees of Dept. of Public Health and Welfare of Mo.* v. *Department of Public Health and Welfare of Mo.*, 411 U. S. 279, 299 (1973) (Brennan, J., dissenting).

the buying or selling of securities in interstate commerce would not be entitled to a jury in any federal criminal prosecution of such fraud. Would persons engaging in securities fraud after the adoption of such an amendment be deemed to have "constructively waived" their constitutionally protected rights to trial by jury in criminal cases? After all, the trading of securities is not so vital an activity that any one person's decision to trade cannot be regarded as a voluntary choice. The answer, of course, is no. The classic description of an effective waiver of a constitutional right is the "intentional relinquishment or abandonment of a known right or privilege." *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938). "[C]ourts indulge every reasonable presumption against waiver" of fundamental constitutional rights. *Aetna Ins. Co.* v. *Kennedy ex rel. Bogash*, 301 U. S. 389, 393 (1937). See also *Ohio Bell Telephone Co.* v. *Public Util. Comm'n of Ohio*, 301 U. S. 292, 307 (1937) (we "do not presume acquiescence in the loss of fundamental rights"). State sovereign immunity, no less than the right to trial by jury in criminal cases, is constitutionally protected. *Great Northern, supra*, at 51; *Pennhurst*, 465 U. S., at 98. And in the context of *federal* sovereign immunity—obviously the closest analogy to the present case—it is well established that waivers are not implied. See, *e. g.*, *United States* v. *King*, 395 U. S. 1, 4 (1969) (describing the "settled propositio[n]" that the United States' waiver of sovereign immunity "cannot be implied but must be unequivocally expressed"). We see no reason why the rule should be different with respect to state sovereign immunity.

Given how anomalous it is to speak of the "constructive waiver" of a constitutionally protected privilege, it is not surprising that the very cornerstone of the *Parden* opinion was the notion that state sovereign immunity is not constitutionally grounded. *Parden*'s discussion of waiver began with the observation:

"By empowering Congress to regulate commerce . . . the States necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation. Since imposition of the FELA right of action upon interstate railroads is within the congressional regulatory power, it must follow that application of the Act to such a railroad cannot be precluded by sovereign immunity." 377 U. S., at 192.

See also *id.*, at 193–194, n. 11. Our more recent decision in *Seminole Tribe* expressly repudiates that proposition, and in formally overruling *Parden* we do no more than make explicit what that case implied.

Recognizing a congressional power to exact constructive waivers of sovereign immunity through the exercise of Article I powers would also, as a practical matter, permit Congress to circumvent the antiabrogation holding of *Seminole Tribe*. Forced waiver and abrogation are not even different sides of the same coin—they are the same side of the same coin. "All congressional creations of private rights of action attach recovery to the defendant's commission of some act, or possession of some status, in a field where Congress has authority to regulate conduct. Thus, *all* federal prescriptions are, insofar as their prospective application is concerned, in a sense conditional, and—to the extent that the objects of the prescriptions consciously engage in the activity or hold the status that produces liability—can be redescribed as invitations to 'waiver.'" *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1, 43 (1989) (SCALIA, J., dissenting). See also *Fitzpatrick*, 427 U. S., at 451–452 (referring to congressional intent to "abrogate" state sovereign immunity as a "necessary predicate" for *Parden*-style waiver). There is little more than a verbal distinction between saying that Congress can make Florida liable to private parties for false or misleading advertising in interstate commerce of its prepaid tuition program, and saying the same thing but adding

at the end "if Florida chooses to engage in such advertising." As further evidence that constructive waiver is little more than abrogation under another name, consider the revealing facts of this case: The statutory provision relied upon to demonstrate that Florida constructively waived its sovereign immunity is the very same provision that purported to abrogate it.

Nor do we think that the constitutionally grounded principle of state sovereign immunity is any less robust where, as here, the asserted basis for constructive waiver is conduct that the State realistically could choose to abandon, that is undertaken for profit, that is traditionally performed by private citizens and corporations, and that otherwise resembles the behavior of "market participants." Permitting abrogation or constructive waiver of the constitutional right only when these conditions exist would of course limit the evil— but it is hard to say that that limitation has any more support in text or tradition than, say, limiting abrogation or constructive waiver to the last Friday of the month. Since sovereign immunity itself was not traditionally limited by these factors, and since they have no bearing upon the voluntariness of the waiver, there is no principled reason why they should enter into our waiver analysis. When we held in *Seminole Tribe* that sovereign immunity barred an action brought under the Indian Gaming Regulatory Act against the State of Florida for its alleged failure to negotiate a gambling compact with the Seminole Tribe of Indians, we did not pause to consider whether Florida's decision not to negotiate was somehow involuntary. Nor did we pause to consider whether running a tugboat towing service at "fair and reasonable rates" was for profit, was traditionally performed by private citizens and corporations, and otherwise resembled the behavior of "market participants" when we held, in *Ex parte New York*, 256 U. S. 490 (1921), that sovereign immunity foreclosed an admiralty action against the State of New

York for damages caused by the State's engaging in such activity. *Hans* itself involved an action against Louisiana to recover coupons on a bond—the issuance of which surely rendered Louisiana a participant in the financial markets.

The "market participant" cases from our dormant Commerce Clause jurisprudence, relied upon by the United States, are inapposite. See, *e. g., White* v. *Massachusetts Council of Constr. Employers, Inc.,* 460 U. S. 204 (1983); *Reeves, Inc.* v. *Stake,* 447 U. S. 429 (1980); and *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794 (1976). Those cases hold that, where a State acts as a participant in the private market, it may prefer the goods or services of its own citizens, even though it could not do so while acting as a market regulator. Since "state proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants," "[e]venhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the [dormant] Commerce Clause." *White, supra,* at 207–208, n. 3. The "market participant" exception to judicially created dormant Commerce Clause restrictions makes sense because the evil addressed by those restrictions—the prospect that States will use custom duties, exclusionary trade regulations, and other exercises of governmental power (as opposed to the expenditure of state resources) to favor their own citizens, see *Hughes, supra,* at 808—is entirely absent where the States are buying and selling in the market. In contrast, a suit by an individual against an unconsenting State is the very evil at which the Eleventh Amendment is directed—and it exists whether or not the State is acting for profit, in a traditionally "private" enterprise, and as a "market participant." In the sovereign-immunity context, moreover, "[e]venhandness" between individuals and States is not to be expected: "[T]he constitutional role of the States sets them apart from other

employers and defendants." *Welch*, 483 U. S., at 477. Cf. *Atascadero*, 473 U. S., at 246.[4]

The United States points to two other contexts in which it asserts we have permitted Congress, in the exercise of its Article I powers, to extract "constructive waivers" of state sovereign immunity. In *Petty* v. *Tennessee-Missouri Bridge Comm'n*, 359 U. S. 275 (1959), we held that a bistate commission which had been created pursuant to an interstate compact (and which we assumed partook of state sovereign immunity) had consented to suit by reason of a suability provision attached to the congressional approval of the compact. And we have held in such cases as *South Dakota* v. *Dole*, 483 U. S. 203 (1987), that Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions. These cases seem to us fundamentally different from the present one. Under the Compact Clause, U. S. Const., Art. I, § 10, cl. 3, States *cannot* form an interstate compact without first obtaining the express consent of Congress; the granting of such consent is a gratuity. So also, Congress has no obligation to use its Spending Clause power to disburse funds to the States; such

---

[4] As for the suggestion of JUSTICE BREYER that we limit state sovereign immunity to noncommercial state activities because Congress has so limited *foreign* sovereign immunity, in accord with the "modern trend," see *post*, at 699 (dissenting opinion) (citing the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U. S. C. § 1605(a)(2)), see also JUSTICE STEVENS's dissent, *post*, at 692: This proposal ignores the fact that state sovereign immunity, unlike foreign sovereign immunity, is a *constitutional* doctrine that is meant to be both immutable by Congress and resistant to trends. The text of the Eleventh Amendment, of course, makes no distinction between commercial and noncommercial state activities—and so if we were to combine JUSTICE BREYER's literalistic interpretation of that Amendment with his affection for FSIA, we would have a "commercial activities" exception for all suits against States except those commenced in federal court by citizens of another State, a disposition that hardly "makes sense," *post*, at 699.

funds are gifts. In the present case, however, what Congress threatens if the State refuses to agree to its condition is not the denial of a gift or gratuity, but a sanction: exclusion of the State from otherwise permissible activity. JUSTICE BREYER's dissent acknowledges the intuitive difference between the two, but asserts that it disappears when the gift that is threatened to be withheld is substantial enough. *Post*, at 697. Perhaps so, which is why, in cases involving conditions attached to federal funding, we have acknowledged that "the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" *Dole, supra*, at 211, quoting *Steward Machine Co.* v. *Davis*, 301 U. S. 548, 590 (1937). In any event, we think where the constitutionally guaranteed protection of the States' sovereign immunity is involved, the point of coercion is automatically passed—and the voluntariness of waiver destroyed—when what is attached to the refusal to waive is the exclusion of the State from otherwise lawful activity.

## V

The principal thrust of JUSTICE BREYER's dissent is an attack upon the very legitimacy of state sovereign immunity itself. In this regard, JUSTICE BREYER and the other dissenters proclaim that they are "not *yet* ready," *post*, at 699 (emphasis added), to adhere to the still-warm precedent of *Seminole Tribe* and to the 110-year-old decision in *Hans* that supports it.[5] Accordingly, JUSTICE BREYER reiterates

---

[5] JUSTICE BREYER purports to "accept this Court's pre-*Seminole Tribe* sovereign immunity decisions," *post*, at 699 (dissenting opinion), but by that he could not mean *Hans*, but rather only the distorted view of *Hans* that prevailed briefly between *Parden* and *Seminole Tribe*. *Parden* was the first case to suggest that the sovereign immunity announced in *Hans* was so fragile a flower that it could be abrogated under Article I—a suggestion contrary to the reality that *Hans itself* involved a congressional conferral of jurisdiction enacted under Article I. See *Pennsylvania* v. *Union Gas*, 491 U. S. 1, 36–37 (1989) (SCALIA, J., dissenting). Moreover, that conferral of jurisdiction was combined, in *Hans*, with a substantive

(but only in outline form, thankfully) the now-fashionable revisionist accounts of the Eleventh Amendment set forth in other opinions in a degree.of repetitive detail that has despoiled our northern woods. Compare *post*, at 700–701, with *Atascadero, supra*, at 258–302 (Brennan, J., dissenting); *Welch, supra*, at 504–516 (Brennan, J., dissenting); *Seminole Tribe*, 517 U. S., at 76–99 (STEVENS, J., dissenting); *id.*, at 100–185 (SOUTER, J., dissenting). But see *Alden* v. *Maine, post*, at 760–808 (SOUTER, J., dissenting). The arguments recited in these sources have been soundly refuted, and the position for which they have been marshaled has been rejected by constitutional tradition and precedent as clear and conclusive, and almost as venerable, as that which consigns debate over whether *Marbury* v. *Madison*, 1 Cranch 137 (1803), was wrongly decided to forums more otherworldly than ours. See *Union Gas*, 491 U. S., at 33–34, 35–42 (SCALIA, J., dissenting); *Seminole Tribe, supra*, at 54–73; *Alden, post*, at 712–730. On this score, we think nothing further need be said except two minor observations peculiar to this case.

---

claim under the Contracts Clause of the Constitution itself, which one would think to have greater, rather than lesser, abrogative force than a substantive statute enacted pursuant to the Commerce Clause. JUSTICE BREYER would apparently interpose that the statute in *Hans* did not expressly "'purpor[t] to pierce state immunity,'" *post*, at 700, quoting *Seminole Tribe*, 517 U. S., at 119 (SOUTER, J., dissenting)—but the opinion in *Hans* did not allude to that refinement, nor did *Parden* think it made any difference. The so-called "clear statement rule" was not even adumbrated until nine years after *Parden*, in *Employees*, 411 U. S., at 284–285. It is difficult to square JUSTICE BREYER's reliance upon the distinction that the present case involves a federal question (and is therefore not explicitly covered by the Eleventh Amendment), see *post*, at 700–701, with its professed fidelity to *Hans*, the whole point of which was that the sovereign immunity reflected in (rather than created by) the Eleventh Amendment transcends the narrow text of the Amendment itself. Or to put it differently, the "pre-*Seminole Tribe* sovereign immunity decisions" to which JUSTICE BREYER pledges allegiance appear to include *Chisholm* v. *Georgia*, 2 Dall. 419 (1793). But see U. S. Const., Amdt. 11.

First, JUSTICE BREYER and the other dissenters have adopted a decidedly perverse theory of *stare decisis.* While finding themselves entirely unconstrained by a venerable precedent such as *Hans,* embedded within our legal system for over a century, see, *e. g., Welch,* 483 U. S., at 494, n. 27; *Union Gas, supra,* at 34–35 (SCALIA, J., dissenting), at the same time they cling desperately to an anomalous and severely undermined decision *(Parden)* from the 1960's. Surely this approach to *stare decisis* is exactly backwards—unless, of course, one wishes to use it as a weapon rather than a guide, in which case any old approach will do.   Second, while we stress that the following observation has no bearing upon our resolution of this case, we find it puzzling that JUSTICE BREYER would choose this occasion to criticize our sovereign-immunity jurisprudence as being ungrounded in constitutional text, since the present lawsuit that he would allow to go forward—having apparently been commenced against a State (Florida) by a citizen of another State (College Savings Bank of New Jersey), 948 F. Supp., at 401–402—seems to fall foursquare within the literal text of the Eleventh Amendment: "The Judicial power of the United States shall not be construed to extend to *any* suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ."   U. S. Const., Amdt. 11 (emphasis added).   See *Seminole Tribe, supra,* at 82, n. 8 (STEVENS, J., dissenting).

As for the more diffuse treatment of the subject of federalism contained in the last portion of JUSTICE BREYER's opinion: It is alarming to learn that so many Members of this Court subscribe to a theory of federalism that rejects "the details of any particular federalist doctrine"—which it says can and should "change to reflect the Nation's changing needs"—and that puts forward as the only "unchanging goal" of federalism worth mentioning "the protection of liberty," which it believes is most directly achieved by "promoting the sharing among citizens of governmental decisionmaking

authority," which in turn demands (we finally come to the point) "necessary legislative flexibility" for the people's representatives in Congress. *Post*, at 702–703. The proposition that "the protection of liberty" is most directly achieved by "promoting the sharing among citizens of governmental decisionmaking authority" might well have dropped from the lips of Robespierre, but surely not from those of Madison, Jefferson, or Hamilton, whose north star was that governmental power, even—indeed, especially—governmental power wielded by the people, *had to be dispersed and countered*. And to say that the degree of dispersal to the States, and hence the degree of check by the States, is to be governed by Congress's need for "legislative flexibility" is to deny federalism utterly. (JUSTICE BREYER's opinion comes close to admitting this when the only example of a "federalism" constraint that it can bear to acknowledge as being appropriate for judicial recognition is the invalidation of a *State's* law under—of all things, given the passion for text that characterizes some parts of his opinion—the "dormant Commerce Clause," *post*, at 703.) Legislative flexibility on the part of Congress will be the touchstone of federalism when the capacity to support combustion becomes the acid test of a fire extinguisher. Congressional flexibility is desirable, of course—but only within the *bounds of federal power* established by the Constitution. Beyond those bounds (the theory of our Constitution goes), it is a menace. Our opinion today has sought to discern what the bounds are; JUSTICE BREYER's dissent denies them any permanent place.

Finally, we must comment upon JUSTICE BREYER's comparison of our decision today with the discredited substantive-due-process case of *Lochner* v. *New York*, 198 U. S. 45 (1905). It resembles *Lochner*, of course, in the respect that it rejects a novel assertion of governmental power which the legislature believed to be justified. But if that alone were enough to qualify as a mini-*Lochner*, the list of mini-*Lochners* would be endless. Most of our judgments in-

validating state and federal laws fit that description. We had always thought that the *distinctive* feature of *Lochner*, nicely captured in Justice Holmes's dissenting remark about "Mr. Herbert Spencer's Social Statics," *id.*, at 75, was that it sought to impose a particular economic philosophy upon the Constitution. And we think that feature aptly characterizes, not our opinion, but JUSTICE BREYER's dissent, which believes that States should not enjoy the normal constitutional protections of sovereign immunity when they step out of their proper economic role to engage in (we are sure Mr. Herbert Spencer would be shocked) "ordinary commercial ventures," *post*, at 694. What ever happened to the need for "legislative flexibility"?

\* \* \*

Concluding, for the foregoing reasons, that the sovereign immunity of the State of Florida was neither validly abrogated by the Trademark Remedy Clarification Act, nor voluntarily waived by the State's activities in interstate commerce, we hold that the federal courts are without jurisdiction to entertain this suit against an arm of the State of Florida. The judgment of the Third Circuit dismissing the action is affirmed.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

This case has been argued and decided on the basis of assumptions that may not be entirely correct. Accepting them, *arguendo*, the judgment of the Court of Appeals should be reversed for the reasons set forth in JUSTICE BREYER's dissent, which I have joined. I believe, however, that the importance of this case and the other two "states rights" cases decided today merits this additional comment.

The procedural posture of this case requires the Court to assume that Florida Prepaid is an "arm of the State" of Florida because its activities relate to the State's educational pro-

grams. *Ante,* at 671. But the validity of that assumption is doubtful if the Court's jurisprudence in this area is to be based primarily on present-day assumptions about the status of the doctrine of sovereign immunity in the 18th century. Sovereigns did not then play the kind of role in the commercial marketplace that they do today. In future cases, it may therefore be appropriate to limit the coverage of state sovereign immunity by treating the commercial enterprises of the States like the commercial activities of foreign sovereigns under the Foreign Sovereign Immunities Act of 1976.[1]

The majority also assumes that petitioner's complaint has alleged a violation of the Lanham Act, but not one that is sufficiently serious to amount to a "deprivation" of its property. *Ante,* at 674–675. I think neither of those assumptions is relevant to the principal issue raised in this case, namely, whether Congress had the constitutional power to authorize suits against States and state instrumentalities for such a violation. In my judgment the Constitution granted it ample power to do so.[2] Section 5 of the Fourteenth Amendment authorizes Congress to enact appropriate legislation to prevent deprivations of property without due process. Unlike the majority, I am persuaded that the Trademark Remedy Clarification Act was a valid exercise of that power, even if Florida Prepaid's allegedly false advertising

---

[1] See 28 U. S. C. § 1605(a)(2) (commercial activity exception to foreign sovereign immunity). The statute provides the following definition of "commercial activity": "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." § 1603(d).

[2] As we held in *Pennsylvania* v. *Union Gas Co.,* 491 U. S. 1, 23 (1989), the Commerce Clause granted Congress the power to abrogate the States' common-law defense of sovereign immunity. I remain convinced that that case was correctly decided for the reasons stated in the principal and concurring opinions.

in this case did not violate the Constitution. My conclusion rests on two premises that the Court rejects.

First, in my opinion *"the activity of doing business,* or *the activity of making a profit," ante,* at 675, is a form of property. The asset that often appears on a company's balance sheet as "good will" is the substantial equivalent of that "activity." It is the same kind of "property" that Congress described in § 7 of the Sherman Act, 26 Stat. 210, and in § 4 of the Clayton Act, 38 Stat. 731. A State's deliberate destruction of a going business is surely a deprivation of property within the meaning of the Due Process Clause.

Second, the validity of a congressional decision to abrogate sovereign immunity in a category of cases does not depend on the strength of the claim asserted in a particular case within that category. Instead, the decision depends on whether Congress had a reasonable basis for concluding that abrogation was necessary to prevent violations that would otherwise occur. Given the presumption of validity that supports all federal statutes, I believe the Court must shoulder the burden of demonstrating why the judgment of the Congress of the United States should not command our respect. It has not done so.

For these reasons, as well as those expressed by JUSTICE BREYER, I respectfully dissent.

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

The Court holds that Congress, in the exercise of its commerce power, cannot require a State to waive its immunity from suit in federal court even where the State engages in activity from which it might readily withdraw, such as federally regulated commercial activity. This Court has previously held to the contrary. *Parden v. Terminal R. Co. of Ala. Docks Dept.,* 377 U. S. 184 (1964). I would not abandon that precedent.

## I

Thirty-five years ago this Court unanimously subscribed to the holding that the Court today overrules. Justice White, writing for four Members of the Court who dissented on a different issue, succinctly described that holding as follows:

> "[I]t is within the power of Congress to condition a State's permit to engage in the interstate transportation business on a waiver of the State's sovereign immunity from suits arising out of such business. Congress might well determine that allowing regulable conduct such as the operation of a railroad to be undertaken by a body legally immune from liability directly resulting from these operations is so inimical to the purposes of its regulation that the State must be put to the option of either foregoing participation in the conduct or consenting to legal responsibility for injury caused thereby." *Id.*, at 198 (opinion of White, J., joined by Douglas, Harlan, and Stewart, JJ.).

The majority, seeking to justify the overruling of so clear a precedent, describes *Parden*'s holding as a constitutional "anomaly" that "broke sharply with prior cases," that is "fundamentally incompatible with later ones," and that has been "narrowed . . . in every subsequent opinion." *Ante*, at 680. *Parden* is none of those things.

Far from being anomalous, *Parden*'s holding finds support in reason and precedent. When a State engages in ordinary commercial ventures, it acts like a private person, outside the area of its "core" responsibilities, and in a way unlikely to prove essential to the fulfillment of a basic governmental obligation. A Congress that decides to regulate those state commercial activities rather than to exempt the State likely believes that an exemption, by treating the State differently from identically situated private persons, would threaten the objectives of a federal regulatory program aimed primarily

at private conduct. Compare, *e. g.*, 12 U. S. C. § 1841(b) (1994 ed., Supp. III) (exempting state companies from regulations covering federal bank holding companies); 15 U. S. C. § 77c(a)(2) (exempting state-issued securities from federal securities laws); and 29 U. S. C. § 652(5) (exempting States from the definition of "employer[s]" subject to federal occupational safety and health laws), with 11 U. S. C. § 106(a) (subjecting States to federal bankruptcy court judgments); 15 U. S. C. § 1122(a) (subjecting States to suit for violation of Lanham Act); 17 U. S. C. § 511(a) (subjecting States to suit for copyright infringement); and 35 U. S. C. § 271(h) (subjecting States to suit for patent infringement). And a Congress that includes the State not only within its substantive regulatory rules but also (expressly) within a related system of private remedies likely believes that a remedial exemption would similarly threaten that program. See *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank, ante,* at 656–657 (STEVENS, J., dissenting). It thereby avoids an enforcement gap which, when allied with the pressures of a competitive marketplace, could place the State's regulated private competitors at a significant disadvantage.

These considerations make Congress' need to possess the power to condition entry into the market upon a waiver of sovereign immunity (as "necessary and proper" to the exercise of its commerce power) unusually strong, for to deny Congress that power would deny Congress the power effectively to regulate *private* conduct. Cf. *California* v. *Taylor,* 353 U. S. 553, 566 (1957). At the same time they make a State's need to exercise sovereign immunity unusually weak, for the State is unlikely to *have to* supply what private firms already supply, nor may it fairly demand special treatment, even to protect the public purse, when it does so. Neither can one easily imagine what the Constitution's Founders would have thought about the assertion of sovereign immunity in this special context. These considerations, differing in kind or degree from those that would support a general

congressional "abrogation" power, indicate that *Parden*'s holding is sound, irrespective of this Court's decisions in *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44 (1996), and *Alden* v. *Maine, post,* p. 706.

Neither did *Parden* break "sharply with prior cases." *Parden* itself cited authority that found related "waivers" in at least roughly comparable circumstances. *United States* v. *California,* 297 U. S. 175 (1936), for example, held that a State, "by engaging in interstate commerce by rail, has subjected itself to the commerce power," *id.,* at 185, which amounted to a waiver of a (different though related) substantive immunity. See also *Taylor, supra,* at 568. *Parden* also relied on authority holding that States seeking necessary congressional approval for an interstate compact had, "by venturing into the [federal] realm 'assume[d] the [waiver of sovereign immunity] conditions . . . attached.'" 377 U. S., at 196 (quoting *Petty* v. *Tennessee-Missouri Bridge Comm'n,* 359 U. S. 275, 281–282 (1959)). Earlier case law had found a waiver of sovereign immunity in a State's decision to bring a creditor's claim in bankruptcy. See *Gardner* v. *New Jersey,* 329 U. S. 565, 573–574 (1947). Later case law, suggesting that a waiver may be found in a State's acceptance of a federal grant, see *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 247 (1985), supports *Parden*'s conclusion. Where is the sharp break?

The majority has only one answer to this question. It believes that this Court's case law requires any "waiver" to be "express" and "unequivocal." *Ante,* at 680. But the cases to which I have just referred show that is not so. The majority tries to explain some of those cases away with the statement that what is attached to the refusal to waive in those cases is "the denial of a gift or gratuity," while what is involved here is "the exclusion of the State from [an] otherwise lawful activity." *Ante,* at 687. This statement does not explain away a difference. It simply states a difference that demands an explanation.

The statement does appeal to an intuition, namely, that it is somehow easier for the State, and hence more voluntary, to forgo "a gift or gratuity" than to refrain from "otherwise lawful activity," or that it is somehow more compelling or oppressive for Congress to forbid the State to perform an "otherwise lawful" act than to withhold "beneficence." But the force of this intuition depends upon the example that one chooses as its illustration; and realistic examples suggest the intuition is not sound in the present context. Given the amount of money at stake, it may be harder, not easier, for a State to refuse highway funds than to refrain from entering the investment services business. See U. S. Dept. of Commerce, Bureau of Census, Federal Aid to States for Fiscal Year 1998, p. 17 (Apr. 1999) (Federal Government provided over $20 billion to States for highways in 1998). It is more compelling and oppressive for Congress to threaten to withhold from a State funds needed to educate its children than to threaten to subject it to suit when it competes directly with a private investment company. See *id.*, at 5 (Federal Government provided over $21 billion to States for education in 1998). The distinction that the majority seeks to make—drawn in terms of gifts and entitlements—does not exist.

The majority is also wrong to say that this Court has "narrowed" *Parden* in its "subsequent opinion[s]," *ante*, at 680, at least in any way relevant to today's decision. *Parden* considered two separate issues: (1) Does Congress have the *power* to require a State to waive its immunity? (2) How *clearly* must Congress speak when it does so? The Court has narrowed *Parden* only in respect to the second issue, not the first; but today we are concerned only with the first. The Court in *Employees of Dept. of Public Health and Welfare of Mo.* v. *Department of Public Health and Welfare of Mo.*, 411 U. S. 279 (1973), for example, discussed whether Congress *had, or had not,* "lift[ed]" sovereign immunity, not whether it *could, or could not,* have done so. *Id.*, at 285

("Congress *did not* lift the sovereign immunity of the States" (emphasis added)). And *Employees'* limitation of *Parden,* to "the area where private persons and corporations normally ran the enterprise," took place in the context of *clarity,* not *power.* 411 U. S., at 284 (specifying that "Congress *can* act" outside the limited area (emphasis added)). Although two Justices would have limited *Parden's* holding in respect to power, that limitation would simply have required Congress to give the States advance notice of the consequence (loss of sovereign immunity), which, as they noted, happened in *Parden.* 411 U. S., at 296–297 (Marshall, J., concurring in result).

The remaining cases the majority mentions offer it no greater support. One said, "We assume, without deciding or intimating a view of the question, that the authority of Congress to subject unconsenting States to suit in federal court is not confined to § 5 of the Fourteenth Amendment." *Welch* v. *Texas Dept. of Highways and Public Transp.,* 483 U. S. 468, 475 (1987). Two others also considered legislative clarity, not power. *Atascadero State Hospital, supra,* at 247 (Rehabilitation Act "falls far short" of clearly indicating a waiver by a State accepting funds under the Act); *Edelman* v. *Jordan,* 415 U. S. 651, 674 (1974) (same for Social Security Act). Even *Seminole Tribe* carefully avoided calling *Parden* into question. While specifying that Congress cannot, in the exercise of its Article I powers, "abrogate unilaterally the States' immunity from suit," 517 U. S., at 59, it left open the scope of the term "unilaterally" by referring to *Parden,* without criticism, as standing for the "unremarkable, and completely unrelated, proposition that the States may waive their sovereign immunity," 517 U. S., at 65. In short, except for those in today's majority, no member of this Court had ever questioned the holding of *Parden* that the Court today discards because it cannot find "merit in attempting to salvage any remnant of it." *Ante,* at 680.

*Parden* had never been questioned because, *Seminole Tribe* or not, it still makes sense. The line the Court today rejects has been drawn by this Court to place States outside the ordinary dormant Commerce Clause rules when they act as "market participants." *White* v. *Massachusetts Council of Constr. Employers, Inc.*, 460 U. S. 204, 206–208 (1983); *Reeves, Inc.* v. *Stake*, 447 U. S. 429, 434–439 (1980); *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 804–810 (1976). And Congress has drawn this same line in the related context of foreign state sovereign immunity. 28 U. S. C. § 1605(a)(2). In doing so, Congress followed the modern trend, which "spread rapidly after the Second World War," regarding foreign state sovereign immunity. 1 Restatement (Third) of Foreign Relations Law of the United States, ch. 5, Introductory Note, p. 391 (1986) (recognizing that "immunity . . . gave states an unfair advantage in competition with private commercial enterprise"); see also Report of the International Law Commission on the Work of its Thirty-Eighth Session, Art. 11, ¶ 1, p. 7 (United Nations Doc. A/41/498, Aug. 26, 1986) (when a State engages in a commercial contract with a foreign person, "the State is considered to have consented to the exercise" of foreign jurisdiction in a proceeding arising out of that contract). Indeed, given the widely accepted view among modern nations that when a State engages in ordinary commercial activity sovereign immunity has no significant role to play, it is today's holding, not *Parden*, that creates the legal "anomaly."

## II

I resist all the more strongly the Court's extension of *Seminole Tribe* in this case because, although I accept this Court's pre-*Seminole Tribe* sovereign immunity decisions, I am not yet ready to adhere to the proposition of law set forth in *Seminole Tribe.* Cf. *EEOC* v. *Wyoming*, 460 U. S. 226, 249–250 (1983) (STEVENS, J., concurring). In my view, Congress does possess the authority to abrogate a State's sover-

eign immunity where "necessary and proper" to the exercise of an Article I power. My reasons include those that JUS-TICES STEVENS and SOUTER already have described in detail.

(1) Neither constitutional text nor the surrounding debates support *Seminole Tribe*'s view that Congress lacks the Article I power to abrogate a State's sovereign immunity in federal-question cases (unlike diversity cases). *Seminole Tribe*, 517 U. S., at 82–83, and nn. 8, 9 (STEVENS, J., dissenting); *id.*, at 142–150 (SOUTER, J., dissenting); cf. the majority's characterization of this argument, *ante*, at 687–688.

(2) The precedents that offer important legal support for the doctrine of sovereign immunity do not help the *Seminole Tribe* majority. They all focus upon a critically different question, namely, whether *courts*, acting without legislative support, can abrogate state sovereign immunity, not whether Congress, acting legislatively, can do so. See *Principality of Monaco* v. *Mississippi*, 292 U. S. 313 (1934); *Hans* v. *Louisiana*, 134 U. S. 1 (1890); *Chisholm* v. *Georgia*, 2 Dall. 419, 429 (1793) (Iredell, J., dissenting); *Seminole Tribe, supra*, at 119 (SOUTER, J., dissenting) ("Because no federal legislation purporting to pierce state immunity was at issue, it cannot fairly be said that *Hans* held state sovereign immunity to have attained some constitutional status immunizing it from abrogation").

(3) Sovereign immunity is a common-law doctrine. The new American Nation received common-law doctrines selectively, accepting some, abandoning others, and frequently modifying those it accepted in light of the new Nation's special needs and circumstances. *Seminole Tribe, supra*, at 130–142 (SOUTER, J., dissenting). The new Nation's federalist lodestar, dual sovereignty (of State and Nation), demanded modification of the traditional single-sovereign immunity doctrine, thereby permitting Congress to narrow or abolish state sovereign immunity where necessary.

(a) Dual sovereignty undercuts the doctrine's traditional "logical and practical" justification, namely (in the words of Justice Holmes), that "there can be no legal right as against the authority that makes the law on which the right depends." *Kawananakoa* v. *Polyblank*, 205 U. S. 349, 353 (1907). When a State is sued for violating federal law, the "authority" that would assert the immunity, the State, is not the "authority" that made the (federal) law. This point remains true even if the Court treats sovereign immunity as a principle of natural law. *Alden* v. *Maine, post,* at 762–764 (SOUTER, J., dissenting).

(b) Dual sovereignty, by granting Congress the power to create substantive rights that bind States (despite their sovereignty) must grant Congress the subsidiary power to create related private remedies that bind States (despite their sovereignty).

(c) Dual sovereignty means that Congress may need that lesser power lest States (if they are not subject to federal remedies) ignore the substantive federal law that binds them, thereby disabling the National Government and weakening the very Union that the Constitution creates. Cf. *McCulloch* v. *Maryland,* 4 Wheat. 316, 407–408 (1819); *Cohens* v. *Virginia,* 6 Wheat. 264, 386–387 (1821).

(4) By interpreting the Constitution as rendering immutable this one common-law doctrine (sovereign immunity), *Seminole Tribe* threatens the Nation's ability to enact economic legislation needed for the future in much the way that *Lochner* v. *New York,* 198 U. S. 45 (1905), threatened the Nation's ability to enact social legislation over 90 years ago.

I shall elaborate upon this last-mentioned point. The similarity to *Lochner* lies in the risk that *Seminole Tribe* and the Court's subsequent cases will deprive Congress of necessary legislative flexibility. Their rules will make it more difficult for Congress to create, for example, a decentralized system of individual private remedies, say a private remedial system needed to protect intellectual property, including

computer-related educational materials, irrespective of the need for, or importance of, such a system in a 21st-century advanced economy. Cf. *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank, ante,* at 656–660 (STEVENS, J., dissenting) (illustrating the harm the rules work to the patent system). Similarly, those rules will inhibit the creation of innovative legal regimes, say, incentive-based or decentralized regulatory systems, that deliberately take account of local differences by assigning roles, powers, or responsibility, not just to federal administrators, but to citizens, at least if such a regime must incorporate a private remedy against a State (*e. g.,* a State as water polluter) to work effectively. Yet, ironically, Congress needs this kind of flexibility if it is to achieve one of federalism's basic objectives.

That basic objective should not be confused with the details of any particular federalist doctrine, for the contours of federalist doctrine have changed over the course of our Nation's history. Thomas Jefferson's purchase of Louisiana, for example, reshaped the great debate about the need for a broad, rather than a literal, interpretation of federal powers; the Civil War effectively ended the claim of a State's right to "nullify" a federal law; the Second New Deal, and its ultimate judicial ratification, showed that federal and state legislative authority were not mutually exclusive; this Court's "civil rights" decisions clarified the protection against state infringement that the Fourteenth Amendment offers to basic human liberty. In each instance the content of specific federalist doctrines had to change to reflect the Nation's changing needs (territorial expansion, the end of slavery, the Great Depression, and desegregation).

But those changing doctrines reflect at least one unchanging goal: the protection of liberty. Federalism helps to protect liberty not simply in our modern sense of helping the individual remain free of restraints imposed by a distant government, but more directly by promoting the sharing among

citizens of governmental decisionmaking authority. See B. Constant, Political Writings 307 (B. Fontana transl. 1988) (describing the "Liberty of the Ancients Compared with that of the Moderns"). The ancient world understood the need to divide sovereign power among a nation's citizens, thereby creating government in which all would exercise that power; and they called "free" the citizens who exercised that power so divided. Our Nation's Founders understood the same, for they wrote a Constitution that divided governmental authority, that retained great power at state and local levels, and which foresaw, indeed assumed, democratic citizen participation in government at all levels, including levels that facilitated citizen participation closer to a citizen's home.

In today's world, legislative flexibility is necessary if we are to protect this kind of liberty. Modern commerce and the technology upon which it rests need large markets and seek government large enough to secure trading rules that permit industry to compete in the global marketplace, to prevent pollution that crosses borders, and to assure adequate protection of health and safety by discouraging a regulatory "race to the bottom." Yet local control over local decisions remains necessary. Uniform regulatory decisions about, for example, chemical waste disposal, pesticides, or food labeling, will directly affect daily life in every locality. But they may reflect differing views among localities about the relative importance of the wage levels or environmental preferences that underlie them. Local control can take account of such concerns and help to maintain a sense of community despite global forces that threaten it. Federalism matters to ordinary citizens seeking to maintain a degree of control, a sense of community, in an increasingly interrelated and complex world.

Courts can remain sensitive to these needs when they interpret statutes and apply constitutional provisions, for example, the dormant Commerce Clause. But courts cannot easily draw the proper basic lines of authority. The proper

local/national/international balance is often highly context specific. And judicial rules that would allocate power are often far too broad. Legislatures, however, can write laws that more specifically embody that balance. Specific regulatory schemes, for example, can draw lines that leave certain local authority untouched, or that involve States, local communities, or citizens directly through the grant of funds, powers, rights, or privileges. Depending upon context, Congress may encourage or require interaction among citizens working at various levels of government. That is why the modern substantive federalist problem demands a flexible, context-specific legislative response (and it does not help to constitutionalize an ahistoric view of sovereign immunity that, by freezing its remedial limitations, tends to place the State beyond the reach of law).

I recognize the possibility that Congress may achieve its objectives in other ways. *Ex parte Young*, 209 U. S. 123 (1908), is still available, though effective only where damages remedies are not important. Congress, too, might create a federal damages-collecting "enforcement" bureaucracy charged with responsibilities that Congress would prefer to place in the hands of States or private citizens, *Alden* v. *Maine, post*, at 755–756; *Printz* v. *United States*, 521 U. S. 898, 977 (1997) (BREYER, J., dissenting). Or perhaps Congress will be able to achieve the results it seeks (including decentralization) by embodying the necessary state "waivers" in federal funding programs—in which case, the Court's decisions simply impose upon Congress the burden of rewriting legislation, for no apparent reason.

But none of these alternatives is satisfactory. Unfortunately, *Seminole Tribe* and today's related decisions separate one formal strand from the federalist skein—a strand that has been understood as antirepublican since the time of Cicero—and they elevate that strand to the level of an immutable constitutional principle more akin to the thought of James I than of James Madison. They do so when the role

sovereign immunity once played in helping to assure the States that their political independence would remain even after joining the Union no longer holds center stage. See *Nevada* v. *Hall*, 440 U. S. 410, 418 (1979). They do so when a federal court's ability to enforce its judgment against a State is no longer a major concern. See The Federalist No. 81, p. 488 (C. Rossiter ed. 1961) (A. Hamilton). And they do so without adequate legal support grounded in either history or practical need. To the contrary, by making that doctrine immune from congressional Article I modification, the Court makes it more difficult for Congress to decentralize governmental decisionmaking and to provide individual citizens, or local communities, with a variety of enforcement powers. By diminishing congressional flexibility to do so, the Court makes it somewhat more difficult to satisfy modern federalism's more important liberty-protecting needs. In this sense, it is counterproductive.

## III

I do not know whether the State has engaged in false advertising or unfair competition as College Savings Bank alleges. But this case was dismissed at the threshold. Congress has clearly said that College Savings Bank may bring a Lanham Act suit in these circumstances. For the reasons set forth in this opinion, I believe Congress has the constitutional power so to provide. I would therefore reverse the judgment of the Court of Appeals.