MARISOL A., by her next friend, Rev. Dr. James Alexander FORBES, Jr., et al., Plaintiffs,

v.

Rudolph W. GIULIANI, Mayor of the City of New York, et al., Defendants.

No. 95 Civ. 10533 RJW.

United States District Court, S.D. New York.

Aug. 29, 2001.

Children's Rights, Inc., New York City by Marcia Robinson Lowry, Lawyers for Children, New York City by Karen J. Freedman, Susan Lambiase, Shirim Nothenberg, Robert Shull, for Plaintiffs.

Eliot Spitzer, Attorney General of the State of New York, New York City by Judith T. Kramer, for Defendants.

## OPINION AND ORDER

WARD, District Judge.

Plaintiffs move for an order directing compliance with certain provisions of the *Marisol* State Settlement Agreement. The Court held an evidentiary hearing on August 9, 10, 13, and 22, 2001. For the following reasons, the motion is granted in part and denied in part.

### BACKGROUND

Plaintiffs filed a complaint in this Court on December 13, 1995, alleging systemic deficiencies in the administration of the New York City child welfare system. The complaint sought declaratory and injunctive relief against various officials of New York City and New York State who were responsible for the operation or oversight of New York's child welfare system.

On the eve of trial, which was to commence on July 27, 1998, the parties informed the Court that they were engaged in settlement negotiations. The trial was adjourned and on December 2, 1998, after four months of negotiations, two settlement agreements were filed with the Court, one agreement between Plaintiffs and the City Defendants and the other between Plaintiffs and the State Defendants. The Court approved the settlement agreements on March 31, 1999. *See Marisol A. v. Giuliani,* 185 F.R.D. 152 (S.D.N.Y.1999), *aff'd,* 218 F.3d 132 (2d Cir. 2000).

One of the goals of the State Settlement Agreement was to strengthen the New York State office that has responsibility for overseeing the New York City child welfare system. To that end, the New York State Office of Children and Family Services ("OCFS") was required to establish and maintain an office in New York City, known as the New York City Regional Office ("NYCRO"). NYCRO's primary function is to monitor and supervise New York City's child welfare system, which is administered by the New York City Administration for Children's Services ("ACS").

The Agreement established a method for Plaintiffs to monitor OCFS's compliance. *See* State Settlement Agreement ¶ 29 (OCFS shall provide copies of certain documents to Plaintiffs); *id.* ¶ 30 (OCFS shall meet with Plaintiffs' counsel periodically to review OCFS's compliance with the Agreement). Prior to taking any action against OCFS arising out of an alleged breach of the Agreement, Plaintiffs were required to provide notice to counsel for OCFS of the areas of alleged noncompliance. OCFS then had to provide Plaintiffs with information sufficient to establish OCFS's reasonable good-faith efforts towards compliance. The parties were then required to make a good-faith effort to resolve any disputes. *See id.* ¶ 34.

Upon approval of the Agreement by this Court, all of Plaintiffs' claims against the State Defendants were dismissed with

prejudice, except that the Court retained jurisdiction "for the sole purpose of enforcing any specific terms and conditions of this Agreement against the Commissioner of OCFS for which Plaintiffs allege non-compliance and the parties have been unable to resolve" under the procedures set forth in ¶ 34. *Id.* ¶ 36. The Agreement further provides: "In the event that Plaintiffs seek judicial enforcement of the term(s) of this Agreement, Plaintiffs will in the first instance seek an order directing compliance with this Agreement and thereafter may, if necessary, seek further judicial remedies to enforce the terms and conditions of this Agreement in dispute." *Id.* ¶ 37.

The Agreement contains a termination provision under which several sections expired on December 31, 2000, while others expired on March 31, 2001. *See* State Settlement Agreement ¶ 38 (the Court will refer to the time during which the Settlement Agreement was in effect as the "Settlement Period").[1] As of this date, every section of the Agreement has expired. Plaintiffs filed their motion on January 8, 2001, and now seek an order directing OCFS to comply with three provisions of the Agreement.[2]

First, ¶ 14 of the Agreement required the State Central Register ("SCR"), a New York State hotline which receives reports of abuse and neglect, to make reasonable efforts to determine that calls are not screened out inappropriately. Second, under ¶¶ 18–21 OCFS had to issue case record reviews in specified areas to insure that ACS engaged in effective casework practice and complied with applicable laws and regulations. Third, under ¶ 22 OCFS

was to use reasonable efforts and means available to it to develop and implement a statewide computer system known as CONNECTIONS.

### *DISCUSSION*

"Settlement agreements are contracts and must therefore be construed according to general principles of contract law." *Red Ball Interior Demolition Corp. v. Palmadessa,* 173 F.3d 481, 484 (2d Cir. 1999). "[A] party cannot create an ambiguity in an otherwise plain agreement merely by 'urg[ing] different interpretations in the litigation.'" *Id.* (citations omitted). If the agreement is clear, "courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." *Id.*

Neither party in the present case contends that the State Settlement Agreement is ambiguous. Thus, the Court will interpret the parties' obligations as set forth within the four corners of the Agreement. Plaintiffs have the burden of demonstrating non-compliance by a preponderance of the evidence. With these guiding principles in mind, the Court turns to the provisions of the Agreement at issue.

### I. The Provisions in Dispute

#### A. The State Central Register—¶ 14

The purpose of ¶ 14 is to ensure that the SCR does not inappropriately screen out reports of abuse and neglect that should be investigated. It states:

---

1. Because December 31, 2000 fell on a Saturday, the sections of the Agreement which were scheduled to expire on that day actually expired on January 2, 2001. *See* Rule 6(a), Fed.R.Civ.P.

2. Since the filing of this motion on January 8, 2001, plaintiffs have withdrawn their claims with respect to two other provisions of the Agreement.

The SCR shall make reasonable efforts to determine that calls are not screened out inappropriately, including the use of its current procedure for periodic spot checks on the screening out of such calls. SCR shall make reasonable efforts to determine how to upgrade its technical capacity to receive calls consistent with its policies.

State Settlement Agreement ¶ 14.

■ Plaintiffs acknowledge that they do not have evidence tending to show that OCFS or the SCR have not complied with ¶ 14. They argue instead that, because the procedures employed by the SCR in assessing the performance of hotline specialists lead to incomplete information, Plaintiffs cannot determine whether OCFS has complied with the Agreement. Defendants counter that the SCR has made, and continues to make, substantial improvements in its monitoring of hotline calls.

Under procedures employed by the SCR, hotline specialists are monitored by SCR supervisors who attempt to reach an independent conclusion as to whether an appropriate screening decision has been made and whether the hotline specialist obtained all available information before making a decision with respect to a call. *See* Affidavit of Teresa Palumbo in Opposition to Plaintiffs' Motion for an Order Directing Compliance ("Palumbo Aff.") ¶¶ 4–5. In May 2000, the SCR revised the form used to assess worker performance in order to increase its utility. It added a data-gathering component which assists supervisors in analyzing screening-out practices. *See id.* ¶¶ 6–9. In addition, the SCR has continuously worked to modify the assessment form as needed to improve performance. *See id.* ¶ 12.[3]

Furthermore, OCFS actively maintains a full staff at the SCR. A "blanket waiver" of the New York State prohibition on hiring new staff enables the SCR to regularly replace staff. Supervisory staffing has been increased to provide guidance twenty-fours hours per day, seven days per week. *See id.* ¶¶ 13–14. These supervisory staff members are, in turn, monitored by the SCR managers who are also involved in the assessment process. *See id.* ¶¶ 18–19.

The SCR employs a supervisory consultation policy which requires a hotline specialist to consult a supervisor when he or she has determined not to act on a report of abuse or neglect. This offers a second level of review prior to declining to act on a call. Additionally, each member of the SCR staff is required to give his or her name to all callers, thereby increasing accountability and the ability to review improperly screened-out calls. *See id.* ¶¶ 15–16. Based on the affidavit of Teresa Palumbo, which essentially went unchallenged, and the lack of any evidence demonstrating a failure to use reasonable efforts to determine whether calls were inappropriately screened out, the Court finds that Plaintiffs have not met their burden of proving non-compliance with ¶ 14 of the State Settlement Agreement.

**B. The Case Record Reviews—¶¶ 18–21**

In order to insure that ACS engaged in effective casework practice and complied with applicable laws and regulations, the State Settlement Agreement directed OCFS to conduct and issue periodic case record reviews. OCFS was required to conduct case record reviews in nine specified areas "to determine ACS's compliance

---

**3.** Counsel for OCFS represented during closing arguments that the SCR has recently revised its assessment form once again to correct problems caused by previous versions of the form.

with applicable laws and reasonable case work practice." State Settlement Agreement ¶ 18. These case record reviews were required to be completed at least once prior to the expiration of the Agreement with copies furnished to Plaintiffs no less than ninety days prior to the expiration of the Agreement. *See id.* ¶ 19. Furthermore, ¶ 21 states:

> If, after completing its case record review(s), OCFS determines that ACS is in substantial non-compliance with applicable laws, regulations and/or reasonable case work practice, OCFS shall direct ACS to take Corrective Action designed to improve ACS's performance in the specific areas of non-compliance. The NYCRO will use reasonable efforts to provide technical assistance and exercise its monitoring authority as it deems necessary and appropriate. OCFS shall meet with Plaintiffs as provided for in Paragraph 30, below, to report such efforts towards achievement of this objective and the last such meeting shall occur at least sixty (60) business days prior to the expiration of this Agreement.

*Id.* ¶ 21. Under ¶ 30, the Commissioner of OCFS and Director of NYCRO were required to meet with Plaintiffs' counsel to review Defendants' compliance with certain provisions of the Agreement on or about April 1 and September 1, 1999, and March 1 and October 7, 2000. *See id.* ¶ 30.

Plaintiffs contend that the last section of ¶ 21 permitted them to meet with OCFS and NYCRO after the last case record review was issued in December 2000 to monitor the corrective action being taken and determine whether NYCRO fulfilled its obligation to insure that ACS adopt appropriate corrective action. Since the corrective action plans, known as Performance Improvement Plans ("PIPs"), were not complete until March and April 2001

and the Agreement expired on March 31, 2001, Plaintiffs argue that they were deprived of their rights under the Agreement.

However, as the Court reads the plain language of the Agreement, it generally required OCFS to do four things. First, OCFS had to undertake case record reviews in certain areas and furnish them to Plaintiffs no less than ninety days prior to expiration of the Agreement. *See id.* ¶¶ 18, 19. Second, if OCFS determined that ACS was in substantial non-compliance, it was required to direct ACS to take corrective action. Third, NYCRO was directed to use reasonable efforts to provide technical assistance to ACS and monitor ACS's performance as NYCRO deemed necessary and appropriate. Fourth, OCFS was required to meet with Plaintiffs pursuant to the terms of ¶ 30 to report efforts towards achieving ACS's compliance, with the last meeting to occur at least sixty days prior to expiration of the Agreement. *See id.* ¶ 21.

■ Defendants met these obligations. OCFS issued the last case record review reports to Plaintiffs on December 28, 2000, ninety-three days before the Agreement was set to expire. After completing the case record reviews, OCFS directed ACS to take corrective action designed to improve ACS's performance in specific areas. *See* Hearing Transcript ("Tr.") at 268. ACS was required to submit PIPs within sixty days addressing those areas in which OCFS believed there was substantial non-compliance with applicable laws, regulations and/or reasonable case work practice. *See id.* at 268–69. During the sixty day period that ACS was drafting the PIPs, NYCRO met with ACS to provide assistance. *See id.* at 269. OCFS and NYCRO rejected ACS's initial proposed PIPs. *See id.* at 270. They required ACS to revise and resubmit their PIPs. ACS's proposed

PIPs were ultimately resubmitted and accepted by OCFS and NYCRO in March and April 2001. *See id.* at 271, 273, 277. The last meeting between Plaintiffs and OCFS pursuant to ¶ 30 was held in October 2000.

Plaintiffs allegedly anticipated that OCFS would furnish the case record reviews *much earlier than* December 2000, and therefore, thought the October 2000 meeting would be timely for the purpose of monitoring OCFS's and NYCRO's efforts. Since the last case record review was not furnished until December 2000 and the PIPs were not approved until March and April 2001, the October 2000 meeting was essentially meaningless for these purposes. However, the parties' obligations are governed by an unambiguous contract with which Defendants have complied. The Court will not read into the clear language an obligation that Plaintiffs contemplated but did not memorialize in writing. Accordingly, the Court finds that OCFS has complied with ¶ 21 of the Agreement.

### C. CONNECTIONS—¶ 22

The federal Administration for Children and Families ("ACF") requires all states to create a Statewide Automated Child Welfare Information System ("SACWIS"). The State Settlement Agreement requires OCFS to make reasonable efforts to implement and maintain New York's SACWIS system, known as CONNECTIONS. Under ¶ 22 of the Agreement:

> OCFS shall use reasonable efforts and means available to it to develop and implement in New York State, at the earliest practicable date, an accurate and reliable state-wide computer system (now referred to as "CONNECTIONS") to provide information concerning: a)

child welfare case activity necessary to manage and supervise the child welfare system and determine compliance with fiscal and legal standards; and b) child welfare case management reports sufficient to create aggregate data on issues including but not limited to: timeliness of investigations; re-occurrence of indicated reports; timeliness of case plans; time in care; number of placements; number of re-entries into care; and adoption statistics.

State Settlement Agreement ¶ 22.

In 1995, New York began to develop CONNECTIONS. *See* Plaintiffs' Exhibit ("Pl.Ex.") K–1. By March 1999, prior to the commencement of the Settlement Period, the CONNECTIONS system was in disarray. A large sum of money had been spent on the system and yet it remained dysfunctional in many key areas. In October 1997, OCFS Commissioner John Johnson received a letter from the child welfare commissioners of the six largest New York counties (the "Big Six" counties), in which the commissioners complained that CONNECTIONS failed to meet their needs.[4] They requested that Commissioner Johnson suspend the development of CONNECTIONS for one year in order to meet with the counties and revisit OCFS's plan for development. *See* Def. Ex. 24. In response, Commissioner Johnson temporarily ceased the development of CONNECTIONS. *See* Tr. at 125.

In 1998, the Office of the State Comptroller (the "OSC") issued a report on the development of CONNECTIONS, which was highly critical of OCFS's efforts to that point. *See* Pl.Ex. K–1. Then in March 1999, at the beginning of the Settlement Period, the New York State Governor's

---

4. The so-called Big Six counties are New York, Erie County, Monroe County, Onondaga County, Suffolk County, and Westchester County. *See* Defendants' Exhibit ("Def.Ex.") 24.

office issued a report prepared by a panel appointed by the Governor, entitled "Panel Review of CONNECTIONS Project." *See* Pl.Ex. M. The report consisted of ten general recommendations in areas in which CONNECTIONS needed improvement. One recommendation was for OCFS to hire a project integrator that would coordinate the CONNECTIONS project until it became operational. *See id.* at 2. Maximus, Inc. was hired as the project integrator in September 1999.

In March 2001, Maximus issued the "CONNECTIONS Reassessment Report," which was generally critical of OCFS's efforts. Maximus did suggest, however, that the system could be saved through future modifications and upgrades. *See* Pl.Ex. W. The Maximus report proposed three alternatives for OCFS to follow to improve CONNECTIONS. First, OCFS could essentially work with what it had in effect at the time. Second, OCFS could make improvements to the then-existing system. Third, OCFS could replace the old CONNECTIONS system by beginning work on a new system. *See id.* at VII–1. OCFS opted for the second alternative.

Also in March 2001, the New York State Assembly issued the results of its investigation into CONNECTIONS. The report, entitled "Too Much, Too Little, Too Late," was generally critical of OCFS's efforts in implementing CONNECTIONS. *See* Pl. Ex. L.

Dr. F. James Seaman, an independent computer consultant in the area of Information Technology management with twenty-five years of experience, testified for Plaintiffs and gave his opinion that OCFS had not made reasonable efforts to develop CONNECTIONS at the earliest practicable date as required by the Agreement. Although he did not think that OCFS necessarily made any missteps in its approach to developing CONNEC-

TIONS during the Settlement Period, he believed OCFS did not act with the sense of urgency mandated by the circumstances. He opined that OCFS should have acted with greater haste in trying to improve a system that was essentially in crisis at the beginning of the Settlement Period. *See* Tr. at 65–66. Furthermore, Dr. Seaman did not believe that OCFS's plan to follow the second alternative proposed by Maximus was a satisfactory approach to fixing CONNECTIONS. *See id.* at 67.

Dr. Seaman also pointed out that the data contained in CONNECTIONS may be inaccurate. *See id.* at 69. In his view, it is critically important for the system's data to be accurate because a functional system that produces inaccurate data is useless. *See id.* at 70.

Larry Brown and Zachary Zambri, the two project directors for CONNECTIONS, testified for OCFS and painted quite a different picture of OCFS's efforts during the Settlement Period. According to Mr. Brown and Mr. Zambri, throughout the Settlement Period OCFS was unable to take several steps in implementing CONNECTIONS due to administrative restraints. For example, at the beginning of the Settlement Period, OCFS had insufficient core staff to implement several measures. It sought to create sixty-four new positions (or "items") but needed support from the legislature, the comptroller, and the governor's office, among others. *See id.* at 126–27. The request for these items was made in 1999 but was not approved in the State's budget until April 2000. *See id.* at 127. In addition, OCFS' effort to engage Maximus as the project integrator was a lengthy process requiring approval by both the OSC and the federal government. *See id.* at 149. While OCFS was waiting for that approval, Maximus began its work, but did so at risk that its contract

with OCFS would not be approved. *See id.* at 150.[5]

Despite these obstacles, OCFS has made efforts to improve CONNECTIONS, with mixed results. The CONNECTIONS system is comprised of a number of "Releases." For example, Release Two, which relates to child protective services, has been operational since 1997. Release Three is the "Foster and Adoptive Home Development" component and is also currently operational. *See id.* at 131–32. OCFS planned to have Release Four, which was the foster care system component, operational by 1997. As of August 2001, it was not in operation. OCFS now estimates that it will not be functional until June 2004.

Release Five would have related to management reports about the foster care data compiled in Release Four. However, since Release Four was not operational in 1997, Release Five would not have worked either. *See id.* at 199. In place of what was originally Release Five, OCFS is using a "Data Warehouse," which was created in early 2000. *See id.* at 119–20, 199. The Data Warehouse project attempts to use data from CONNECTIONS, in conjunction with data from the Child Care Review Service ("CCRS"), an existing computer information system, to address the needs of OCFS's users. *See* Affidavit of Larry Brown in Opposition to Plaintiffs' Motion for an Order Directing Compliance ("Brown Aff.") ¶ 8. However, while most of the data in the Data Warehouse is currently available, it is not scheduled to be fully operational until the end of 2001. *See* Tr. at 207–08.

Also, OCFS is currently implementing CITRIX, a program that allows OCFS to update the 15,000 computers across the State which use CONNECTIONS applications. Prior to CITRIX, each of those 15,000 computers had to be updated by hand. With CITRIX, OCFS can quickly fix applications without having to rely on manual corrections which could only be done approximately twice per year. *See id.* at 133–34.

Furthermore, OCFS has created the Child Protective Record Summary ("CPRS"), a program that gives caseworkers easier access to files on their computers by improving the visual organization of information on their screens. *See id.* at 144–45. The CPRS is scheduled to be operational in October 2001. *See id.* at 217.

In addition to these structural changes, OCFS has apparently gained the support of some of its former critics. For example, the OSC, which had been critical of OCFS in its 1998 report, *see* Pl.Ex. K–1, issued a second report in October 1999 indicating that it believed OCFS had made "significant progress in implementing the recommendations" contained in the first report. *See* Pl.Ex. K–5.

The federal government has also signaled its approval of the steps OCFS is taking with regard to CONNECTIONS. In order to enter into any contract relating to CONNECTIONS, OCFS is required to have prior federal government approval since the project must comply with federal SACWIS requirements. *See* Tr. at 344. At the beginning of the Settlement Period, OCFS's relationship with the federal government was so poor that federal funds had been suspended and OCFS could not get approval for many of its contracts. However, since the commencement of the

---

5. Mr. Brown and Mr. Zambri testified that the New York State government's scrutiny of CONNECTIONS-related contracts and fi-nance requests has been more rigorous than anything they have seen in decades of State government service. *See* Tr. at 149, 347.

Settlement Period, federal funding has been restored. *See id.* at 159.

Furthermore, on April 16, 2001, the commissioners of the Big Six counties wrote to Commissioner Johnson. Whereas their first letter to Commissioner Johnson in October 1997 requested that OCFS suspend the development of CONNECTIONS for one year because it worked so poorly, in April 2001 the commissioners believed that OCFS had taken their initial concerns "seriously and began a very productive dialogue" with them. Def. Ex. 25. In addition, the commissioners indicated that they supported OCFS's recommendations. *See id.*

■ It is undisputed that OCFS does not currently have a complete, functional, statewide computer system, or even a date by which one can be expected. Of course, the Agreement did not require OCFS to complete the system during the Settlement Period, only that it use "reasonable efforts and means available to it" to develop and implement the system at the "earliest practicable date." State Settlement Agreement ¶ 22.

At the hearing, the Court was presented with conflicting evidence with regard to the reasonableness of OCFS's efforts. On the one hand, two reports published in March 2001 were highly critical of OCFS's efforts. Furthermore, Dr. Seaman gave his opinion that OCFS has not made reasonable efforts to develop CONNECTIONS at the earliest practicable date. On the other hand, it is clear from the evidence presented by OCFS that OCFS has made commendable efforts to improve CONNECTIONS. Nevertheless, many of the measures taken by OCFS during the Settlement Period were preliminary steps necessary to achieve the ultimate goal of functionality. OCFS will not know the results of its efforts for some time. Accordingly, although it is a close question,

the Court finds it appropriate to enter an order directing OCFS to comply with ¶ 22.

## II. Remedy

■ Having found that OCFS has failed to comply with ¶ 22 of the Agreement, the Court must fashion a remedy that will insure compliance. Plaintiffs ask the Court to continue its jurisdiction over ¶ 22 of the Agreement and assign an independent monitor to supervise OCFS's efforts. While the Court will agree to continue its jurisdiction over ¶ 22, an independent monitor is not warranted. Despite the fact that CONNECTIONS is not yet fully functional, the Court is convinced that the program is now in capable hands and that OCFS is working hard toward achieving compliance with ¶ 22 of the Agreement. Furthermore, there is enough independent oversight of OCFS through Maximus and the executive and legislative branches of the New York State government to insure that OCFS will continue to work diligently towards full implementation of CONNECTIONS.

Nevertheless, the Court and Plaintiffs should be kept informed of OCFS's progress. Accordingly, the Court continues its jurisdiction over ¶ 22 and directs that OCFS comply with ¶ 22 and furnish semi-annual reports to the Court with copies to Plaintiffs' attorneys. The first report shall be furnished on January 2, 2002 and the last report shall be furnished when the system is fully functional.

### A. Authority in the State Settlement Agreement

■ Defendants object to the Court's continuing jurisdiction. They argue that the Agreement contains an express and unconditional expiration date and no mechanism by which to extend that date. Under the Agreement, ¶ 22 expired on March 31, 2001. *See* State Settlement Agreement

¶ 38. However, the Agreement states that the Court shall "retain jurisdiction for the sole purpose of enforcing any specific terms and conditions" of the Agreement for which Plaintiffs allege non-compliance. *Id.* ¶ 36. "Where the parties to a settlement agreement provide for the Court to retain jurisdiction over the settlement agreement, the Court has jurisdiction to enforce the terms of the settlement agreement." *Scharf v. Levittown Public Schs.*, 970 F.Supp. 122, 129 (E.D.N.Y.1997).

By filing their motion prior to the expiration date of March 31, 2001, and otherwise following the procedures set forth in the Agreement for attempting to resolve disputes, Plaintiffs preserved their right to challenge Defendants' compliance with the Agreement notwithstanding the fact that ¶ 22 has since expired. Since the Court has determined that OCFS has not complied, the Court can, pursuant to ¶ 36, retain jurisdiction over ¶ 22 solely to enforce that paragraph. This includes the authority to enter all orders necessary to enforce the Agreement. If the Court were precluded from retaining jurisdiction or limited in its ability to enforce its order beyond the expiration date, the order and the Agreement's enforcement provisions would lack any significance.

## B. Eleventh Amendment Immunity

Defendants also argue that under the Eleventh Amendment, the Court lacks jurisdiction to award any relief against OCFS that goes beyond the specific terms of the State Settlement Agreement. They contend that the Court's jurisdiction is limited to entering an order directing OCFS to comply with ¶ 22 of the Agreement. Plaintiffs counter that by entering into the Settlement Agreement and consenting to the Court's continuing jurisdiction, Defendants waived their Eleventh Amendment immunity defense.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although the text of the Amendment bars suits in federal court against a state "by Citizens of another State," it is well-established that "sovereign immunity extends beyond the literal text of the Eleventh Amendment to bar a citizen from suing his own state under federal question jurisdiction." *McGinty v. New York*, 251 F.3d 84, 91 (2d Cir.2001) (citing *Hans v. Louisiana*, 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). However, there are two exceptions to the general rule. First, Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment, and second, a state may waive its sovereign immunity by consenting to suit. *See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999).

Plaintiffs contend that this court has jurisdiction under the second exception, the State's waiver of immunity. The Supreme Court has said, "our 'test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one.'" *Id.* at 675, 119 S.Ct. 2219 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)). Generally, a court will find a waiver either if the state voluntarily invokes the jurisdiction of the federal courts or if the state makes a "clear declaration" that it intends to submit itself to federal court jurisdiction. *See id.* at 675–76, 119 S.Ct. 2219. A state will be deemed to have waived its immunity "only where stated 'by the most express

language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909)).

■ A state may waive its Eleventh Amendment immunity by entering into a settlement agreement in which it unequivocally agrees to subject itself to federal court jurisdiction. For example, in *Watson v. Texas,* 261 F.3d 436 (5th Cir.2001), the court relied on two clauses in a settlement agreement in holding that Texas waived its immunity for a limited class of disputes. The first clause stated: "[The parties] acknowledge that this Court has jurisdiction over the subject matter of this action and over each of the parties hereto, and that this court shall retain jurisdiction for the purpose of implementing and enforcing this Settlement Agreement." *Id.* at *2–3. The second clause stated that the parties "agree to present any disputes under this Settlement Agreement, including without limitation any claims for breach or enforcement of this Settlement Agreement, exclusively to this Court." *Id.* at *3.

While the court recognized that vesting of jurisdiction alone is not sufficient to waive Eleventh Amendment immunity, *see id.* (citing *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 251, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985)), by consenting to jurisdiction "for the purposes of implementing and enforcing" the Agreement, Texas waived its immunity defense. The court reasoned that "[o]rdinary usage suggests that 'enforcing' the Agreement might entail one party suing the other, which would be impossible unless Texas's consent to jurisdiction embodied a waiver of its Eleventh Amendment immunity." *Id.; see also Cabazon Band of Mission Indians v. Wilson,* 124 F.3d 1050, 1057

(9th Cir.1997) (state waived its Eleventh Amendment immunity by entering into Tribal–State Compacts in which state expressly agreed that judicial review of any action by either party would be had "solely in the appropriate United States District Court"), *cert. denied,* 524 U.S. 926, 118 S.Ct. 2319, 141 L.Ed.2d 694 (1998).

■ Although a state can waive the immunity defense in a settlement agreement, such a waiver will not be found absent unequivocal, express language of waiver. For example, in *Ellis v. University of Kansas Med. Ctr.,* 163 F.3d 1186 (10th Cir.1998), the court held that "the fact that the defendants here entered into a settlement agreement with Ellis does not act as a waiver of the defendants' constitutionally protected immunity because the settlement agreement does not itself indicate, nor does the record otherwise reflect, an unequivocal intent to waive the immunity by the agreement." *Id.* at 1195; *see also Johns v. Stewart,* 57 F.3d 1544, 1554 (10th Cir.1995) (state's partial settlement does not constitute waiver of immunity absent unequivocal expression of waiver); *Saahir v. Estelle,* 47 F.3d 758, 762 (5th Cir.1995) (state's participation in settlement agreement insufficient to waive its sovereign immunity); *Sharafeldin v. Maryland, Dep't of Pub. Safety and Corr. Serv.,* 94 F.Supp.2d 680, 686–87 (D.Md. 2000) (state did not waive its immunity defense where settlement agreement provided for enforcement in the "courts" but did not specify enforcement in federal courts).

■ In this case, several provisions of the Agreement support the Court's determination that Defendants waived their immunity defense. First, ¶ 36 of the Agreement provides that "the Court shall retain jurisdiction for the sole purpose of enforcing any specific terms and conditions of this Agreement against the Commissioner

of OCFS for which Plaintiffs allege non-compliance and the parties have been unable to resolve." State Settlement Agreement ¶ 36. Second, ¶ 37 provides that, in the event Plaintiffs seek judicial enforcement of the terms of the Agreement, they will "in the first instance seek an order directing compliance with this Agreement and thereafter may, if necessary, seek further judicial remedies to enforce the terms and conditions of this Agreement in dispute." *Id.* ¶ 37. Third, ¶ 41 states:

All class-wide or systemic claims arising from new facts and/or circumstances that occur during the duration of this Agreement and which relate in any way to any claim raised in the Pre–Trial Order are resolved by this Agreement, except that this Agreement shall not preclude any individual class member from filing an action on their own behalf against State Defendants or either of them during the duration of this Agreement for the purpose of seeking damages and/or equitable relief to protect rights, well-being and interests of such present or future class members; provided, however, that: 1) such equitable relief must be limited to that which is necessary or appropriate to redress the individual class member's injury, and 2) *this Agreement shall not constitute, be construed as or be read as a consent by the State Defendants, or either of them, to be sued in federal court, or as a waiver of any defense of sovereign immunity the State Defendants, or either of them, may seek to raise, including an Eleventh Amendment immunity from suit in federal court.*

*Id.* ¶ 41 (emphasis added).

Reading these three provisions together, the Court finds that Defendants unequivocally waived their Eleventh Amendment immunity defense for the purpose of this enforcement proceeding. Under ¶ 36, De-fendants clearly consented to this Court's jurisdiction to enforce the Agreement. As the Fifth Circuit said in *Watson*, 2001 WL 883533 at *3, while consenting to jurisdiction alone is insufficient to waive the immunity defense, consenting to jurisdiction for the purpose of enforcing the Agreement necessarily constitutes a waiver of immunity because it contemplates that the Court may entertain some type of action against Defendants. If Defendants consented to this Court's jurisdiction for the purpose of enforcing the Agreement but were then able to assert the immunity defense, the Court's retention of jurisdiction would be meaningless.

Furthermore, ¶ 37, which clarifies this Court's powers under the Agreement and is clearly related to ¶ 36, permits Plaintiffs to seek "further judicial remedies" to enforce the Agreement. The Agreement does not limit what judicial remedies are available. Like Defendants' consent to the Court's jurisdiction to enforce the Agreement, Defendants' consent to permit Plaintiffs to seek further judicial remedies evinces their unequivocal waiver of Eleventh Amendment immunity.

Finally, Defendants' apparent reservation of their immunity defense in ¶ 41 of the Agreement is unavailing here. It is clear from the plain language of that paragraph, and the placement of the language in the section of the Agreement dealing with the rights of class members to bring individual actions, that the language reserves Defendants' right to raise the immunity defense in such individual actions, and not in a proceeding to enforce the Agreement in this Court. Accordingly, the Court finds that Defendants have waived their Eleventh Amendment immunity defense.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for an order directing compliance

with ¶¶ 14 and 21 of the State Settlement Agreement is denied. Plaintiffs' motion for an order directing compliance with ¶ 22 of the State Settlement Agreement is granted to the extent that the Court will continue its jurisdiction over ¶ 22 until the Court determines that Defendants have complied with that paragraph. OCFS is directed to furnish semi-annual reports to the Court with copies to Plaintiffs' attorneys. The first report shall be furnished on January 2, 2002. These reports shall summarize OCFS's progress in developing CONNECTIONS and provide sufficient information to enable the Court to ascertain whether OCFS is using reasonable efforts and means available to it to develop and implement CONNECTIONS at the earliest practicable date.

It is so ordered.