### In re METROMEDIA FIBER NETWORK, INC., et al., Debtors.

### Metromedia Fiber Network Services, Inc., Plaintiff,

### v.

### Washington Metropolitan Area Transit Authority, Defendant.

Bankruptcy Nos. 02–22736 (ASH) to 02–22742(ASH), 02–22744(ASH) to 02–22746(ASH), 02–22749(ASH), 02–22751(ASH) to 02–22754(ASH).

Adversary No. 02–5283(ASH).

United States Bankruptcy Court, S.D. New York.

Aug. 1, 2002.

Kronish Lieb Weiner & Hellman, LLP, by Ronald R. Sussman, New York City,

for Metromedia Fiber Network Services, Inc.

Office of General Counsel, by Joseph J. Zimmerman, Washington, D.C., for Washington Metropolitan Area Transit Authority.

Chadbourne & Parke, LLP, by Seven Rivera, New York City, for the Official Committee of Unsecured Creditors.

## DECISION ON DEFENDANT'S MOTION TO DISMISS COMPLAINT AND MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

Debtor-plaintiff Metromedia Fiber Network Services, Inc. ("MFNS") filed this adversary proceeding seeking injunctive relief on July 18, 2002. At a hearing late in the afternoon on the same day, July 18, this Court signed a scheduling order setting August 1, 2002 as the return date for a motion by MFNS for a preliminary injunction restraining defendant Washington Metropolitan Area Transit Authority ("WMATA") from (1) terminating its pre-petition executory license agreement with MFNS or otherwise interfering with the operation of the business of MFNS, (2) interfering with or disrupting MFNS's business and (3) seeking to recover the pre-petition debt allegedly owed by MFNS to WMATA. The July 18 scheduling order included a temporary restraining order ("TRO") pending the August 1 hearing. Although WMATA received actual notice of the July 18 hearing on the TRO, WMATA did not appear at that hearing or otherwise oppose the relief requested.

On July 25, 2002, WMATA moved to dismiss this adversary proceeding under Fed.R.Civ.P. 12(b) (made applicable to adversary proceedings under Bankruptcy Rule 7012) and to dissolve the TRO on the grounds that this Court is barred by the Eleventh Amendment to the United States Constitution from exercising jurisdiction over WMATA and that the TRO is unconstitutional. On WMATA's application, an accelerated hearing on the motion was held on July 31, 2002. For the reasons stated below, WMATA's motion to dismiss and to vacate the TRO is denied.

### Background

MFNS, a Delaware Corporation, and other affiliated debtors (referred to collectively as the "Debtors") filed voluntary petitions under Chapter 11 on May 20, 2002 which are being jointly administered. The Debtors provide fiber optic infrastructure, high-bandwidth internet connectivity and managed internet infrastructure for customers in the United States and Europe, including communications carriers, corporations and government entities.

WMATA has its principal place of business in Washington, DC, and is an "interstate compact agency" which by federal law is an agency and instrumentality of the State of Maryland and the Commonwealth of Virginia. *See Clarke v. Washington Metro. Area Transit Auth.*, 654 F.Supp. 712, 713 (D.D.C.1985); WMATA Compact, D.C.Code Ann. § 1–1107.01 (2001). The WMATA "Compact" is, in effect, its charter. WMATA operates a public mass transit rail system in the Washington, D.C., metropolitan area. As part of its public mass transit rail system, WMATA has constructed and maintains underground tunnels and surface transportation corridors, rights of way referred to as the "WMATA ROW."

Pursuant to a license agreement dated April 19, 1999 (the "License Agreement"), between MFNS and WMATA, MFNS placed fiber and related equipment in conduits in the WMATA ROW. The License Agreement is an executory contract and property of the MFNS bankruptcy estate.

Each strand of fiber is utilized by a different MFNS customer for any of a variety of purposes, including Internet access, telephone communications and other methods of internal and external communications.

In March 2002 MFNS received an invoice from WMATA seeking payment of approximately $2,232,000 for use of the WMATA ROW during the period of April 2002 to April 2003 and past-due labor charges for August through November 2001. MFNS did not pay the invoice. WMATA sent a notice of delinquency and a notice of default on May 2, 2002, and June 13, 2002, respectively. The latter notice (the "Default Notice"), sent after the filing of the Chapter 11 petition, stated that failure by MFNS to pay all past-due balances (i.e., the pre-petition debt) within 30 days after the date of the notice "will result in the License Agreement being terminated as of the date thirty (30) calendar days after receipt of this letter—'Termination Date'," that "[a]ll services provided by WMATA to [Debtors] under the ... License Agreement will cease as of the Termination Date," that "[Debtors'] business activities on WMATA property must also cease as of the Termination Date" and that the Debtors would be "required to cease all communications traffic on or through WMATA property as of the Termination Date." Finally, the Default Notice advised that "third party users or customers affected thereby should be notified as soon as possible and told to make alternative arrangements."

Attempts to reach an agreement with WMATA were not successful, and on July 17, 2002, Debtors were advised by counsel for WMATA that "WMATA has not consented to the jurisdiction of the Bankruptcy Court. It has not, and will not, waive its immunity from the process of that Court." WMATA's July 17, 2002 letter concluded as follows:

we again advise [Debtors] to make alternative arrangements for carriage of customer communications after the date set for termination of the License Agreement, e.g., on July 19, 2002. WMATA reserves its full rights under law to proceed against [Debtors] in the event that [Debtors'] business operations on WMATA property do not cease at that time.

Faced with the potentially dire consequences of this threat, and precluded from complying with WMATA's demand for payment of its prepetition debt without order of this Court on notice to all parties in interest, MFNS filed the instant adversary proceeding seeking a preliminary and permanent injunction prohibiting WMATA from (1) terminating the License Agreement; (2) interfering with the business of MFNS; or (3) seeking to recover the prepetition debt allegedly owed by MFNS to WMATA.

MFNS alleges that in threatening to terminate the License Agreement for failure to pay the pre-petition debt due WMATA violates the "automatic stay" provisions of the Bankruptcy Code found in 11 U.S.C. § 362(a), which prohibits, *inter alia*, "any act to obtain possession of property of the estate" and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." [1] MFNS further asserts that

---

1. Ironically, given the vital importance of the License Agreement to MFNS, counsel for the debtors represented that it is a virtual certainty that the License Agreement will be assumed under Section 365. A prerequisite to assumption, found in Section 365(b)(1) provides that:

If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

WMATA, in seeking to terminate the License Agreement, discriminates against MFNS in violation of 11 U.S.C. § 525(a).[2]

The TRO was granted based upon a *prima facie* showing by the Debtors that if WMATA were not enjoined from discontinuing service under the License Agreement, irreparable injury would be sustained not only by the Debtors but by the users of MFNS's fiber network in the Washington, D.C., area whose telecommunications services would be terminated. MFNS's attorney Richard S. Kanowitz, in his Affidavit in support of the TRO, states:

> if WMATA is allowed to terminate the license agreement based upon the failure of [the Debtor] to pay the pre-petition debt, such conduct will cause irreparable injury to the Debtors and their bankruptcy estates because the fiber network of the Debtors in the Washington D.C. area will cease to function and otherwise operate properly. A termination of the license agreement would seriously disrupt telecommunications services provided to fiber customers of the Debtors in the Washington D.C. area. Without such telecommunications services, the business of such customers in the Washington D.C. area may come to a halt.

A partial list of the businesses which could be disrupted by termination of the License Agreement include AboveNet, Adelphia Communications, America Online, AT & T, BBC, Cox Communications, Deutsche Telecom, Gannett Company, Inc., Global Crossing, Sprint, Verizon, Williams, and XO Communications. MFNS alleges that an even more grievous consequence of termination of the License Agreement is the potential threat to public welfare and safety because some of the users of services provided by MFNS are hospitals and government entities that carry out essential operations by means of the telecommunications services provided by MFNS and supplied through the WMATA ROW.

At the request of the Court, WMATA explained the steps it would take immediately upon termination of the License Agreement, barring injunctive relief or a consensual resolution. First, WMATA would forbid access to the WMATA ROW by MFNS personnel, placing locks on the "fiber huts," the current means of accessing the switches and equipment. In the event of an emergency involving public health or safety, WMATA anticipates it would be able to have a critical line repaired, either by permitting an MFNS technician to enter the fiber huts, or by bringing in a third-party technician.

---

> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

2. Section 525(a) provides in relevant part that:

> a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title ... solely because such bankrupt or debtor is or has been a debtor under this title ..., has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title....

Eventually WMATA would make a final demand that MFNS cease operations through the WMATA ROW. If WMATA's demands are not met, WMATA states that it would take no further steps until an order is obtained from a judge with competent jurisdiction, most likely in the District of Columbia.

In its instant motion, WMATA does not address MFNS's allegations of potential serious and irreparable harm not only to the MFNS and its affiliates, but to some of the largest businesses in America, as well as government agencies. WMATA argues only that this Court lacks jurisdiction to entertain MFNS's suit against WMATA or its pleas for injunctive relief. It is implicit in WMATA's argument that it views this Court as powerless to prevent the harm which would result from termination of the License Agreement.

### Discussion

### I. *Jurisdiction*

In arguing that this Court has no jurisdiction, WMATA relies upon the doctrine of sovereign immunity and the Eleventh Amendment to the United States Constitution, which provides that:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Sovereign immunity, referring to a state's immunity from suit without the state's consent, is a related but older concept, which is "a fundamental aspect of the sovereignty which the states enjoyed before the ratification of the Constitution, and which they retain today." *Alden v. Maine*, 527 U.S.

706, 713, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).[3]

■ Where a plaintiff seeks recovery from a state or governmental unit, there are two ways to pierce sovereign immunity: (1) Congress can abrogate a state's Eleventh Amendment immunity, or (2) a state may waive its immunity and consent to be sued. *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Board,* 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Sacred Heart Hosp. of Norristown v. Pennsylvania (In re Sacred Heart Hosp. of Norristown),* 133 F.3d 237, 242 (3d Cir.1998).

### A. *Abrogation*

It is expressly stated in 11 U.S.C. § 106(a) that "[n]otwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section," with respect to several of the provisions of the Bankruptcy Code, including Sections 362 and 525. Yet whether a bankruptcy court has jurisdiction under Section 106(a) to subject a state or governmental unit to monetary damages, injunction or contempt has been called into question following the Supreme Court's decision in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). *Seminole* struck down a statute abrogating states' sovereign immunity in connection with the Indian Gaming Regulatory Act and held:

> Even when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States. The Elev-

---

**3.** For purposes of this decision the Court assumes (without deciding) that this adversary proceeding is a "suit" for Eleventh Amendment and sovereign immunity purposes. The issue, which is contested by MFNS, is not resolved by this ruling.

enth Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction.

*Id.* at 72–73, 116 S.Ct. 1114.

The Court in *Seminole* set forth a two-part test for determining the validity of a claim of abrogation (*Id.* at 55, 116 S.Ct. 1114) (citations and internal quotations omitted):

> In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has unequivocally expressed its intent to abrogate the immunity; and second, whether Congress has acted pursuant to a valid exercise of power.

The first part of this test is not at issue in a bankruptcy case. Section 106(a) of the Bankruptcy Code is an unequivocal expression of Congress' intention to abrogate sovereign immunity.

Part two of the test—whether Congress had the legislative power under Article I of the Constitution to abrogate sovereign immunity in 11 U.S.C. § 106—presents a more difficult issue, which has not been addressed by the Supreme Court.

MFNS argues that state sovereign immunity in respect of bankruptcy matters was relinquished by reason of Article I, Section 8 of the Constitution, which vests in Congress the exclusive power "to establish ... uniform Laws on the subject of Bankruptcies throughout the United States". Congress' exclusive power to establish "uniform" bankruptcy law "throughout the United States" is unquestionably undermined if creditor-states can invoke sovereign immunity, which gives rise to a compelling inference that the states must necessarily have ceded their

immunity as to bankruptcy matters by agreeing to this provision in Article I, Section 8. MFNS further contends that a proceeding in bankruptcy is an in rem proceeding to which sovereign immunity does not apply. A lucid analysis of these positions is to be found in Bankruptcy Judge Randolph J. Haines' decision in *Bliemeister v. Industrial Comm'n of Arizona (In re Bliemeister)*, 251 B.R. 383 (Bankr. D.Ariz.2000), *aff'd* 296 F.3d 858 (9th Cir. 2002).[4] Finally, MFNS argues that Congress had the power to abrogate the Eleventh Amendment under the Fourteenth Amendment.

WMATA points out, however, that every Circuit Court that has considered the issue following the Supreme Court's decision in *Seminole*, to wit, the Third, Fourth, Fifth and Ninth Circuits, has held that Section 106(a) was not enacted by Congress "pursuant to a valid exercise of power" and is therefore unconstitutional. *Mitchell v. Franchise Tax Board (In re Mitchell)*, 209 F.3d 1111 (9th Cir.2000) (in revoking sovereign immunity under Section 106(a) Congress exceeded its authority under Article I of the Constitution, nor could such revocation be viewed as an appropriate exercise of Congress' powers under the Fourteenth Amendment); *In re Sacred Heart Hosp. of Norristown*, 133 F.3d 237 (dismissing adversary proceeding against governmental unit demanding judgment for amounts owed pursuant to state's medical assistance program and rejecting argument that Section 106(a) was enacted pursuant to a valid exercise of power under Article I or the Fourteenth Amendment); *Schlossberg v. Maryland (In re Creative Goldsmiths of Washington, D.C. Inc.)*, 119 F.3d 1140 (4th Cir.1997) (holding that "Congress is not empowered to use Article I authority, specifically the Bankruptcy

---

4. The Ninth Circuit affirmed on the ground that sovereign immunity had been waived.

Clause, to circumvent the Eleventh Amendment's restriction on federal jurisdiction," and dismissing action against comptroller of state treasury to avoid preferential payment); *Dept. of Transp. & Dev. v. PNL Asset Mgmt. Co. (In re Fernandez),* 123 F.3d 241 (5th Cir.1997) (holding that Congress lacks authority to abrogate sovereign immunity under Section 106(a) and dismissing adversary proceeding disputing state's claim of title to property).

While none of these Circuit Courts has specifically addressed the issue, several lower courts have held that where a state or governmental unit has not waived its sovereign immunity, the bankruptcy court is powerless to rectify or enjoin a violation of the automatic stay under Section 362 or of the protection against discriminatory treatment in Section 525(a). *See, e.g., In re Burkhardt,* 220 B.R. 837, 844 (Bankr. D.N.J.1998) ("any decision by this Court to restore driving privileges to a debtor, pursuant to Bankruptcy Code section 362, 525 or otherwise, would be violative of the State of New Jersey's Eleventh Amendment immunity from federal suit"); *In re Perez,* 220 B.R. 216 (Bankr.D.N.J.1998) (court could not resort to Sections 105 or 525 to restore debtor's driving privileges); *Louis; Harris v. Barall (In re Louis; Harris),* 213 B.R. 796 (Bankr.D.Conn.1997) (court lacked subject matter jurisdiction over governmental units to award money damages or to hold them in contempt for violating the automatic stay); *In re Martinez,* 196 B.R. 225 (D.P.R.1996) (bankruptcy court lacked jurisdiction over gov-

ernmental unit that willfully violated the automatic stay by placing a lien on the debtors' property); *Tri–City Turf Club, Inc. v. Kentucky Racing Comm'n (In re Tri–City Turf Club, Inc.),* 203 B.R. 617 (Bankr.E.D.Ky.1996) (court lacked jurisdiction to entertain adversary proceeding seeking injunctive relief to prevent state commission from revoking the license of the debtor).

There can be no doubt that the invocation of sovereign immunity by states after *Seminole* in bankruptcy proceedings gives rise to serious anomalies in and obstacles to the Article I, Section 8 mandate to Congress to establish (and the courts to administer) "uniform Laws on the subject of Bankruptcies throughout the United States."[5] However, because I hold that WMATA waived its sovereign immunity, it is not necessary to resolve the issues raised by these contentions of the parties.

### B. *Waiver*

■ Regarding waiver, under Bankruptcy Code Section 106(b):

A governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose.

To date WMATA has not filed a proof of claim. Absent a filed proof of claim under Section 106(b), a state's waiver of sovereign immunity must be "express" and "unequivocal." *College Savings Bank v. Flor-*

---

5. *See, e.g., Berkelhammer v. Novella (In re Berkelhammer),* 279 B.R. 660, 665, n. 3 (Bankr.S.D.N.Y.2002), in which the bankruptcy court expressed its concern that a "blanket invocation and application of sovereign immunity could have a devastating effect on the operation of the Bankruptcy Code and the bankruptcy process." Even more poignant

here is the scholarly authority cited by Judge Drain in *In re Berkelhammer,* that "One greedy governmental creditor can undo all the good for literally millions of debtors, creditors, employees, and communities." *Id.* (quoting Klee, Johnston & Winston, *State Defiance of Bankruptcy Law,* 52 Vand.L.Rev. 1527, 1535 (1999)).

*ida Prepaid Postsecondary Educ. Expense Board*, 527 U.S. at 680, 119 S.Ct. 2219. The Supreme Court has rejected the notion of "constructive waiver":

> Recognizing a congressional power to exact constructive waivers of sovereign immunity through the exercise of Article I powers would also, as a practical matter, permit Congress to circumvent the antiabrogation holding of *Seminole Tribe*. Forced waiver and abrogation are not even different sides of the same coin—they are the same side of the same coin.

*Id.* at 683, 119 S.Ct. 2219. *See also AER–Aerotron, Inc. v. Texas Dept. of Transp. (In re AER–Aerotron, Inc.)*, 104 F.3d 677 (state's written demand for payment of a claim does not constitute "filing a proof of claim in the case" under 106(b)) (4th Cir. 1997).

 In the WMATA Compact, WMATA is expressly given the authority "except as limited in this Title" to "sue and be sued." D.C.Code Ann. § 9–1107.1(12)(a). Under the heading "Liability for Contracts and Torts," Section 80 of the Compact provides that:

> [WMATA] shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent [sic] committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflicts of laws), but shall not be liable for any torts occurring in the performance of a governmental function. The exclusive remedy for such breach of contracts and torts for which the Authority shall be liable, as herein provided, shall be by suit against the Authority. Nothing contained in this title shall be construed as a waiver by the District of Columbia, Maryland, Virginia and the counties and cities within in the Zone of any immunity from suit.

WMATA does not contend that the License Agreement is not of a proprietary nature, nor does it contend that its conduct relating to the License Agreement would be construed as a tort "occurring within the performance of a governmental function". *See, e.g., Qasim v. Washington Metro. Area Transit Auth.*, 455 A.2d 904, 906 (D.C.1983) (providing mass transportation is a "proprietary function" under Section 80 of the Compact). Sections 12(a) and 80 of the Compact reveal that WMATA has waived its sovereign immunity and may "be sued" for "conduct of any proprietary function" in connection with a contract. In such a situation, those sections of the Compact indicate that WMATA should be treated as any other party. *See Smith v. Washington Metro. Area Transit Auth.*, 290 F.3d 201, 206 (4th Cir.2002) (WMATA "has waived immunity in certain circumstances, i.e., when it is engaged in proprietary functions, while specifically preserving its immunity for 'torts occurring in the performance of a governmental function'."); *Beebe v. Washington Metro. Area Transit Auth.*, 129 F.3d 1283, 1289 (D.C.Cir.1997) ("Section 80 of the Compact waives WMATA's sovereign immunity for contractual disputes."). Thus, WMATA, like any other creditor or lessor, should be held liable for its conduct when that conduct is in violation of the Bankruptcy Code.

Furthermore, WMATA has subjected itself to suit in federal court. Under the heading "Jurisdiction of Courts," Section 81 of the Compact provides that:

> The United States District Courts *shall have original jurisdiction*, concurrent with the courts of Maryland, Virginia and the District of Columbia, *of all actions brought by or against the Authority* and to enforce subpoenas issued under this Title. Any such action initiated in a State or District of Columbia Court

shall be removable to the appropriate United States District Court in the manner provided by [28 U.S.C. § 1446]. (emphasis supplied)

Pursuant to 28 U.S.C. § 1334(a), the district courts "shall have original and exclusive jurisdiction of all cases under title 11." Under 28 U.S.C. § 157(a), "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." In the Southern District of New York, cases under Title 11 are referred to bankruptcy judges pursuant to the standing order of reference signed by Acting Chief Judge Ward on July 10, 1984.

In addition to Sections 12(a), 80 and 81 of the WMATA Compact, the License Agreement confirm's WMATA's waiver of sovereign immunity. Section 27.3 provides:

> *Governing Law and Binding Effect.* This License Agreement *shall be governed* by and *construed* and *enforced in accordance with* the laws (other than the law governing conflicts of law questions) and decisions of the District of Columbia, and *all applicable federal laws,* rules and regulations .... (first emphasis in original and other emphasis supplied)

WMATA in making the License Agreement specifically contemplated that the License Agreement would be "governed by and construed and enforced in accordance with ... federal laws, rules and regulations," including the Bankruptcy Code.

At oral argument, counsel for WMATA argued that Section 12(a) of the Compact, which permits WMATA "except as limited in this Title" to "[s]ue and be sued" is limited by Section 80. WMATA reads the provision in Section 80, that it "shall be liable for its contracts," as waiver only as to a suit regarding a breach of contract, but does not subject WMATA to suit in connection with an attempt to cancel or collect monies due under a contract in violation of the Bankruptcy Code. WMATA asserts that the License Agreement's provision in Section 27.3 that the agreement "shall be governed by and construed and enforced in accordance with ... all applicable federal laws" cannot change this limitation because the Compact is the applicable law, which waives WMATA's immunity only to the extent set forth in Section 80. Finally, WMATA views Section 81 as a venue provision, rather than a conferral of jurisdiction upon the federal courts.

WMATA's strained interpretation of Section 80 ignores the significance of that section's final sentence: "Nothing contained in this Title shall be construed as a waiver by the District of Columbia, Maryland, Virginia and the counties and cities within the Zone of any immunity from suit." Far from a limitation on Section 12(a), Section 80 is an acknowledgment that WMATA has waived sovereign immunity as to WMATA regarding its contracts. Section 80 is not a limitation on WMATA's waiver of sovereign immunity and consent to "sue and be sued" in section 12(a) of the Compact. Nor is Section 80 an impediment to the License Agreement's governance and enforcement "in accordance with ... *all* applicable federal laws," including the Bankruptcy Code. In one sense, WMATA is correct that Section 27.3 of the License Agreement has little significance in light of Section 12(a) and Section 80 of the Compact. Because the Compact waives sovereign immunity regarding contractual disputes, the License Agreement, like any other agreement, is unquestionably to be governed and enforced in accordance with the provisions of the Bankruptcy Code.

Finally, it is noteworthy that the restrictive construction of Section 80 of the Compact urged by WMATA on this motion is inconsistent with its conduct in other lawsuits in which WMATA defended suits arising out of contractual disputes with the plaintiff on the merits without asserting sovereign immunity. *See Trandes Corp. v. Guy F. Atkinson Co.,* 996 F.2d 655 (4th Cir.1993) (defending against breach of contract, breach of fiduciary duties and misappropriation of trade secrets); *Elcon v. Washington Metro. Area Transit Auth.,* 977 F.2d 1472 (D.C.Cir.1992) (disappointed bidder sued WMATA seeking to set aside WMATA's award of contract to another bidder).

## II. *Ex parte Young not applicable*

MFNS contends, as an additional ground for subjecting WMATA to the authority of this Court, that an exception to the doctrine of sovereign immunity first recognized in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), should be applied in this case. The *Ex parte Young* doctrine permits suit of a state official to enjoin a violation of federal law notwithstanding the fact that the state could assert sovereign immunity.

■ Although striking down the statute at issue in *Seminole* for violating the Eleventh Amendment and sovereign immunity, the Supreme Court in *Seminole* reaffirmed the applicability of *Ex parte Young* as a means of asserting "federal jurisdiction

over a suit against a state official when that suit seeks only prospective injunctive relief in order to 'end a continuing violation of federal law.'" 517 U.S. at 73, 116 S.Ct. 1114 (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)) *See also Berkelhammer v. Novella (In re Berkelhammer),* 279 B.R. 660, 664 (Bankr.S.D.N.Y.2002) (*"Ex parte Young* permits prospective relief against state officers based on the fiction that such a suit is not an action against a 'state' but, rather, is meant to prevent an individual's continuing violation of federal law."). The Supreme Court recently explained the function of *Ex parte Young* as:

> based in part on the premise that sovereign immunity bars relief against States and their officers in both state and federal courts, and that certain suits for declaratory or injunctive relief against state officers must therefore be permitted if the Constitution is to remain the supreme law of the land.

*Alden v. Maine,* 527 U.S. at 747, 119 S.Ct. 2240.[6]

■ In *Seminole,* the Supreme Court indicated that *Ex parte Young* would be applied where (1) "the suit seeks only prospective injunctive relief" and (2) and where Congress has not "prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right." 527 U.S. at 73–74, 119 S.Ct. 1849.[7] In *Edelman v. Jordan,* 415 U.S.

---

6. The potentially catastrophic effect of such a governmental creditor, immune from the bankruptcy process, illustrates the continuing necessity of the *Ex parte Young* doctrine. See footnote 5, *ante,* and accompanying text.

7. The Supreme Court explained its rationale for the second requirement in *Seminole,* 517 U.S. at 74, 116 S.Ct. 1114:

 where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right,

a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young.*

In declining to apply *Ex parte Young* to that case, the Court cited the "intricate procedures" prescribed by Congress in Section 2710(d)(7) of the Indian Gaming Regulatory Act and concluding that "it is difficult to see why an Indian tribe would suffer through the intricate scheme of § 2710(d)(7) when more

651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Supreme Court limited the application of *Ex parte Young* to prospective relief. However, "[w]here prospective relief is sought against individual state officers in a federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar." *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 276–77, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). "Indeed, since *Edelman* we have consistently allowed suits seeking prospective injunctive relief based on federal violations to proceed." *Id.* at 277, 117 S.Ct. 2028.

*Ex parte Young* was recently applied in *In re Berkelhammer,* 279 B.R. 660, to enjoin the Commissioner of the New York State Department of Health from further violation of Section 525(a) of the Bankruptcy Code. *See also In re LTV Steel Co.,* 264 B.R. 455 (Bankr.N.D.Ohio 2001) (applying *Ex parte Young* to enjoin state officials from collection efforts in violation of automatic stay); *Horwitz v. Zywiczynski (In re Zywiczynski),* 210 B.R. 924, 933 (Bankr. W.D.N.Y.1997) (after *Seminole* "the *Ex parte Young* doctrine is now of heightened importance" as a federal court remedy for state violations of federal laws enacted under Article I, § 8).

■ *Ex parte Young* would appear to be applicable to this case. MFNS seeks only prospective relief, enjoining WMATA from violating Sections 362 and 525(a), and neither section contains a "detailed remedial scheme" for enforcement. However, MFNS has sued only WMATA. Thus, unlike *Berkelhammer,* where the court was able to enjoin the Commissioner notwithstanding NYSDH's defense of sovereign

immunity, *Ex parte Young* is inapplicable in this case unless and until an amended complaint is served upon a responsible official of WMATA.[8]

### Conclusion

WMATA's motion to dismiss this adversary proceeding and dissolve the TRO for lack of jurisdiction is denied. The temporary restraining order dated July 18, 2002 shall remain in full effect pending a final hearing on the TRO, at a date and time to be scheduled by the Court. At that hearing, WMATA will have an opportunity to rebut the *prima facie* showing that it has violated Sections 362 and 525(a) and that it should be enjoined from further violations of those sections. Counsel for the debtor shall submit an order consistent with this decision.

---

complete and more immediate relief would be available under *Ex parte Young.*" *Id.* at 75, 116 S.Ct. 1114.

8. The proceeding in *Berkelhammer* was originally brought only against the NYSDH, but during the hearing on a motion to dismiss by NYSDH under Rule 12(b)(1) and (6) NYSDH

agreed to deem the complaint to be amended to add a responsible officer of NYSDH as a defendant and to delete NYSDH as a defendant. NYSDH also agreed to deem Berkelhammer's pleadings to be a motion for summary judgment.